**EDWIN K. WILLIAMS & CO., INC., a California corporation, Plaintiff,**

**v.**

**EDWIN K. WILLIAMS & CO.—EAST, a Virginia corporation, and Marcoin, Inc., a Virginia corporation, Defendants.**

**No. 70–2037–DWW.**

United States District Court,
C. D. California.

June 18, 1974.

Grossman, Smaltz, Graven & Perry, Los Angeles, Cal., for plaintiff.

Tuttle & Taylor, Los Angeles, Cal., for defendant.

Huebner & Worrel, Los Angeles, Cal., for defendants on counterclaims, Kemp Printing Co.

## MEMORANDUM

DAVID W. WILLIAMS, District Judge.

Beginning about 1935 Edwin K. Williams engaged in the business of designing and providing bookkeeping and business management systems for oil companies and record-keeping books for service station dealers, and of furnishing counseling services to aid them in inventory control, record keeping and the orderly operation of their business. His business was operated under the name of Edwin K. Williams and Co. and he has used various other designations, trademarks and trade names including "Profit Guide," "Quick Sales Recorder," "Profit Analyzer" and "Serv-A-Station Inc."

Fred G. Harris joined plaintiff's staff in 1946 and remained about three years, working generally out of the Los Angeles office. After a stint in the Navy, Harris rejoined Williams in 1952. Just prior to this reunion, Williams had barnstormed the East for business and had received a few accounts, but had made no real progress in developing that territory. In 1952 Williams entered into an agreement which gave Harris the right to "sell, market and promote all bookkeeping systems, forms, books and methods" under the names used by plaintiff, in the states East of the Mississippi River (with stated exceptions). The agreement further gave Harris the right to market under his own name, or under plaintiff's name. Harris had the right to set up sublicensees to distribute the bookkeeping services and he was required to pay plaintiff 30% of the gross revenue he received from this source. Plaintiff turned over to Harris the few accounts he had developed in the Eastern area and from that point henceforth, plaintiff operated West of the Mississippi River (hereinafter called Williams-West) and Harris operated generally East of that line (hereinafter called Williams-East). At first Harris used the name "Fred G. Harris Company, Eastern Representative of Edwin K. Williams and Company" and also used the Serv-A-Station name in his territory; in 1957 he began to phase it out and by 1960 he was using the name Edwin K. Williams and Co., (Va.) (later Edwin K. Williams and Co.—East). Paragraph 7 of the 1952 agreement called for Harris to "use his best efforts to develop said Eastern territory and to maintain the good will of the companies now using Williams' books and systems."

Both Mr. Williams and Mr. Harris were firm, hard-headed businessmen.

Williams often scolded Harris for what he considered dereliction of duty in developing the territory and generally tried to maintain the posture of a hard-driving taskmaster over Harris. On the other hand, Harris openly resented the mannerisms of Williams in this regard, but always managed to stay just short of open rebellion against his dominance. The parties to this lawsuit have shared in presenting upwards of 6,000 exhibits consisting of letters between the two men, bulletins and promotional material distributed by Williams to his own branches and licensees and to the branches and sublicensees of Harris, and communications between Harris and his sublicensees. In the latter, Harris attempted to convey the idea that they were all one large national family but that he (Harris) was the "sole proprietor" of the business in the East and that any cooperation between his sublicensees and E. K. Williams and Company in the West was only in the interest of maintaining a national image. A perusal of these many documents provides an interesting saga of the sublimated rivalry between Williams and Harris and the determination of each to maintain a posture of superiority over the other. Needless to say, there were many business disputes that took place concerning the development of the Eastern territory, promotion of the Williams' name and over accountings of funds flowing from one to the other.

Mr. Williams died in 1963 and his widow succeeded him as the head of plaintiff company. No shy violet, the widow quickly stepped into the breach and put together an excellent management team. She showed no intention of letting her husband's project founder or of letting his former associates take over. Her relations with Mr. Harris were no improvement over those that existed between her husband and Mr. Harris and by 1968 their relations were almost at the breaking point. Harris' desire to hold a management seminar outside his territory and within plaintiff's territory caused plaintiff to file a lawsuit against him in the United States District Court in San Francisco in 1968. In an attempt to settle this lawsuit and the many disputes that existed between the parties, Mrs. Williams and her associates and attorneys met with Mr. Harris and his associates and attorneys for four days and hammered out a Settlement Agreement and a Revised Agreement dated July 25, 1968 which purported to resolve all disputes between them and to lead to the dismissal of the San Francisco lawsuit. The Revised Agreement further stated that it was the specific intent of the parties that this agreement shall supercede all other agreements between the parties and that "this Revised Agreement is entire and constitutes all of the promises and representations made by the parties herein to one another." [1] The agreement further states that "all prior agreements between the parties, including all agreements set forth in Article II hereof, are hereby terminated and superceded in their entirety by this Revised Agreement." [2]

■ Despite all these efforts at reconciliation, the parties fell to quarreling again and by the middle of 1970 each was refusing to account to the other for commissions due, and plaintiff filed this action. During the pendency of this lawsuit and sometime in February, 1972 Harris and his associates openly repudiated the Revised Agreement, taking the position that it was unenforceable and invalid.

Despite the pronouncements within the Revised Agreement that it is an integrated document which supercedes all earlier agreements of the parties, defendant contends that one must resort to an interpretation of the 1952 agreement in order to determine the true intent of the parties as respects whether the arrangement between the parties was a licensor-licensee situation or an outright sale by plaintiff to Harris of the exclu-

1. Article XXIII.

2. Article XXVI.

sive right to sell plaintiff's record-books, management services and seminars in the Eastern district. Harris further stoutly contends that both the 1952 and the 1968 agreements amount to an outright sale to him of the right to the use of the name "Edwin K. Williams and Co." in his territory. In support of this he points to the use of the word "grant" in each agreement as opposed to the use of the word "license." I desire to put to rest immediately the contention of Mr. Harris that somehow the words of either agreement amount to a sale to him of the exclusive right to the name "Edwin K. Williams" within his Eastern district. Nowhere in either agreement are there used any words that would reflect this intent. Nowhere in either agreement is there any language that says specifically "Williams sells to Harris the exclusive right to the use of the name 'Edwin K. Williams' in the Eastern territory." The plain language of a contract should govern. It should set its limits and fix its boundaries.

The pertinent reference to this in the 1952 agreement is set forth in paragraph 1 thereof as follows:

1.   "That Second Party does hereby grant, bargain and sell unto First Party the exclusive right, title and interest to sell, market and promote all bookkeeping systems, forms, books, and methods *under said names*, which now are used by Second Party, . . . " (emphasis added). (Exh. DX 406).

In the 1968 Revised Agreement the scope of the right is referred to in paragraph III A thereof in these words: " . . . the right to *utilize* and to license others to *utilize* the trade names and trademarks used by Williams, . . . ." (emphasis added). There is nothing whatsoever in the language of either the 1952 or the 1968 agreement that would support the contention of defendant that there was an outright sale to him of the use of the Edwin K. Williams name in his territory. Paragraph VII D of the Revised Agreement goes so

far as to enjoin Harris from using the Edwin K. Williams name or any contraction thereof in connection with any activities not related to the subject of the contract, or the petroleum industry. Only by the boldest assertion of arrogance can Harris breach his contract with plaintiff, openly repudiate it, and then maintain that he has the right to continue the use of the Edwin K. Williams name in or without his territory. His claim that the acknowledged widespread acceptance of this name in the petroleum-oriented industry and the good will it has attained is due to his efforts to promote and publicize the name, was surrendered when he repudiated the Revised Agreement.

I turn to a consideration of whether the two agreements amount to a license to Harris, as contended by plaintiff, or a grant or sale as contended by defendant. In an earlier Order in this case I concluded that the clear language of the contract conflicts with defendant's interpretation and that what was sold involved a marketing right, not a sale. I made reference to Professor Callman's work thusly:

"If the grant of the exclusive use of a trademark is limited as to duration or *area* (emphasis my own), it will not confer title thereto upon the licensee. A licensee acquires only the right to a limited use of the trademark, for the title to the reversionary interest in that use remains with the owner." Callman, 3 Unfair Competition, Trademarks and Monopolies, § 78.2 (3rd Edition 1971 Supp.).

■ "Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1890). "The broad fundamental practical difference between an assignment and a license is that the former gives the transferee the right to sue for infringement and the latter gives the transferee immunity from suit for in-

fringement. The first gives positive rights, the second negative rights." Ellis on Patent Assignments and Licenses (2d Ed.) Sec. 57 P. 64. Citing Bloomer v. McQuewan, 14 How. 539, 549, 14 L. Ed. 532 (1852); Moto Meter Co. v. National Gauge & Equipment Co., 31 F.2d 994 (D.Del.1929). Although the word "grant" is not ordinarily used to mean "license" it may mean "license" if the transfer instrument does not vest the entire interest in the alienee. Preload Enterprises, Inc. v. Pacific Bridge Co., 86 F.Supp. 976 (D.Del.1949).

█ It must also be noted that the 1952 agreement was drafted by attorneys for Harris and that Williams was without the aid of a lawyer at that time, except that he depended upon the advice of a lawyer and close personal friend of Harris whom Williams consulted at Harris' urging. This attorney had assisted in the early draft of the agreement which was revised somewhat by Harris after consulting his lawyers in the East. If then, the contract is ambiguous, it must be construed most strictly against Harris. County of Alameda v. So. Pac. Ry. Co., 55 Cal.2d 479, 488, 11 Cal.Rptr. 751, 360 P.2d 327 (1961); Silva v. Meyer, 129 Cal.App.2d 15, 19, 276 P.2d 174 (1954); Yamanishi v. Bleily & Collishaw, Inc., 29 Cal.App.3d 457, 463, 105 Cal.Rptr. 580 (1972).

█ Nothing in the communications between these two men prior to the 1952 agreement, or in their relations since that agreement, and nothing in the relations between Mrs. Williams and Harris leading up to the 1968 agreement infer an intent to do anything but license Harris to market plaintiff's product and services in the Eastern states, utilizing the Williams name.

The very nature of the contract supports this conclusion. In a real sense, it all began with Harris being little more than an order-taker for Williams. As the relationship progressed, Harris certainly emerged as assuming a much more important role, and indeed became the proprietor of a first-class organization which perhaps accounted for at least half of Williams-West's total book business.

It is significant that the contract called for Harris to solicit book orders in his territory and have the *customer* forward the order directly to Williams-West in California. After reviewing the order, Williams-West would send it to Kemp Printing Company in Los Angeles to be printed and that company would ship the book directly to the customer who would then send his check in payment thereof to Williams-West. Williams-West would then forward the commission due Williams-East to it by its own check. A similar commission would go to defendant on sales of book-sets to oil companies headquartered in defendant's territory.

Conversely, the Revised Agreement called for Williams-East to pay to Williams-West a sum equal to 30% of the gross monthly revenue from the licensees and branch offices of Williams-East.

There was therefore a constant exchange of monies and a continuous flow of reports, accountings and demand for audits between the two parties. Nowhere in this record is there room for the finding that these were two separate and independent business houses, whose records were kept confidential from one another or who were competitors (or in an antitrust sense, potential competitors) with one another. On the other hand the record is replete with evidence of close interface. Harris held himself out as the Eastern Representative of Edwin K. Williams & Company. He encouraged his people to aid in creating and selling the image of a national company. Harris served on plaintiff's Board of Directors following the death of Mr. Williams and until 1966. National conventions were held and Harris aided Mrs. Williams plan several of these and became a speaker at some of them. At times, Harris would ask permission of Williams to do certain things within his territory (Exh. 52) and there were times that Williams would push Harris

to gain greater saturation within his area. Williams often sent his bulletins and sales promotion material to Harris' licensees and branches, apparently without serious objection from Harris. (Illustration—Exh. 108 and 1086). Harris wrote his people telling them of standardizing plans (Exh. 136) on a national basis and boasted in another letter of being a part of Edwin K. Williams Company nationally (Exh. 350). There were times when Harris referred to having the right to sub-license a city within his East territory (Exh. 2237) although generally he characterized his role differently.

The Williams-East people often visited the Williams-West plant to observe its operations and techniques and when regional conventions were held within defendant's territory, officials from Williams-West often attended and participated and sometimes shared the expense of it.

Defendants argue that the agreement should be construed a grant rather than a license because defendant operated a "sole proprietorship" and plaintiff had no control over it or the right to police its conduct. To the contrary the evidence points to many areas of control and supervision. Williams-East promised to use its best efforts at all times to conduct and promote the sale of Williams Company booksets in its territory. It also promised to actively solicit new licensees. Williams-East promised to pay all commissions due Williams-West promptly. The Revised Agreement compelled defendant to change its corporate name to Edwin K. Williams-East and to use only the following name designation on letterheads, brochures, etc.:

Edwin K. Williams & Co.—East
Eastern Representative
Edwin K. Williams & Co.

Williams exercised that control by rejecting out of hand Harris' suggestion that the name be changed to permit reference to the product as the Williams System or Williams Plan. (DX 408). Williams forbade Harris the right to use the Edwin K. Williams' name in any business Harris might enter that was not related to the petroleum industry.[3] Harris was compelled by the Revised Agreement to keep adequate books and records in connection with his operation and Williams reserved the right to inspect or audit such records.[4] Harris was obligated to notify Williams of copyright infringement by third persons if he learned of any such. The Revised Agreement called for the right of Williams to terminate the contract if Williams-East failed to make prompt payments and then the territory would revert to Williams-West. The parties made provision for a standardization committee to attempt to prepare identical licensee agreements. All these facts bear heavily upon the determination of Mr. Williams to maintain a measure of control over the operation of Williams-East. I find that the Revised Agreement, as well as its predecessor agreement, was a license covenant.

## ANTITRUST CONTENTIONS

An agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition is a horizontal restraint of trade and a per se violation of Section 1 of the Sherman Act. Because horizontal territorial limitations serve no purpose other than the stifling of competition, they are considered naked restraints of trade. To determine whether a horizontal restraint exists it is necessary to examine the substance and structure of the association. In United States v. Sealy, Inc., 388 U.S. 350, 87 S. Ct. 1847, 18 L.Ed.2d 1238 (1967), Sealy licensed others to manufacture and sell bedding products under its name and

---

3. In point of fact Harris did enter the escrow business and was compelled by the Revised Agreement to operate it under another name.

4. The Revised Agreement also compelled Williams to maintain adequate records and Harris could audit same.

copyrights for a royalty. It fixed retail prices and allocated exclusive market areas among the licensees. The 30 licensees were compelled to buy stock in the parent company in order to become licensees. All of the board members of Sealy were licensees. It was, in fact, a joint venture and an instrumentality of the licensees rather than a true vertical arrangement. The Court found that defendant was substantially owned and controlled by the licensees and therefore they were chargeable with the imposition of the territorial restraints in violation of Section 1 of the Sherman Act.

In United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), the Court discussed horizontal per se restraints which are violative of Sherman Section 1. Topco is a cooperative association of 25 small to medium-sized regional supermarket chains. The members, who controlled the operations of the association and had a veto power of sorts as to new members, were given exclusive territories for the sale at retail of the association's private label products and could only sell such products at wholesale to specific geographic areas and under conditions imposed by the association. It was held that this constituted a horizontal restraint between competitors and was therefore a per se violation of Section 1. See also Timken Rollerbearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L. Ed. 1199 (1951).

■ Price fixing arrangements, both vertical (United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960)), and horizontal (United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)), have been held to be per se violations of the antitrust laws. A vertical arrangement is the fixing of restrictions between a manufacturer and his dealers or licensees. The true test of legality in limitations or restrictions is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competi-

tion. Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683, 687 (1918).

■ In the case at bar there exists a measure of control by the licensor over the licensees, however there is no feature of reverse control whereby the licensees, as compelled or permitted stockholders in the parent company, or officers thereof, have control over the operations of Williams-West. The rule seems to be that in situations involving related corporations, where the party imposing the restriction is not truly independent from the restricted parties, then such an agreement is deemed an illegal per se horizontal restraint. The imposing party then will be considered the mere agent of the restricted parties whenever the restricted parties possess control. United States v. Topco Associates, supra; United States v. Sealy, supra.

In United States v. Penn-Olin Chemical Co., 217 F.Supp. 110 (D.Del.1963), the Court held that "it is not every lessening of competition which is forbidden . . . ." by the antitrust laws. The Court there found no horizontal restraint because the parties were seen as far removed from being actual competitors and therefore no per se violation of Section 1 existed.

■ I conclude that under the facts of this case there is a vertical rather than a horizontal arrangement and that such territorial restrictions placed by Williams-West on Williams-East are justified as reasonable steps taken to implement a valid copyright licensing system.

■ Having determined that this case does not involve illegal horizontal restraints between competitors or potential competitors, we must now determine whether there exist vertical restraints which violate Section 1. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), aids in illustrating the type of analysis which must be made. There the Government charged a conspiracy between defendant and its distributors involving al-

location of exclusive territories to the distributors and confinement of merchandise to franchise dealers. The District Court held that the territorial limitations were unlawful per se with respect to products sold by the defendant to its distributors, but that the limitation was not unlawful insofar as it is incident to sales by the defendant itself to franchise retailers where the distributor served the sole function of agent or consignee.

The Supreme Court held that a per se violation of Section 1 results when a vertical restriction exists where the manufacturer *sells* products to its distributors subject to territorial restrictions upon resale. Such a restraint is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it.

However, the Court held that where the manufacturer retains dominion, title, and risk with respect to the product and the function of the dealer or distributor in question is indistinguishable from that of an agent or salesman of the manufacturer, it is only if the impact of the vertical territorial restraint is "unreasonably" restrictive of competition that a violation of Section 1 results.

The Court felt that the rule of reason would be satisfied if:

a) the manufacturer adopted the challenged distribution program in a competitive situation' dominated by mass merchandisers which command access to large-scale advertising and promotion, choice of retail outlets and adequate sources of supply,

b) the manufacturer's practices do not result in an inadequate competitive situation with respect to the relevant market,

c) the manufacturer's program does not exceed the limits necessary to meet the competitive problems posed by more powerful competitors.

Finally, the Court said that its holding should not be interpreted to suggest that in any and all circumstances where a single manufacturer has unilaterally adopted the agency or consignment pattern and the *Schwinn* type of restrictive distribution would such practice be justified by the presence of competition of mass merchandisers and by the demonstrated need of the franchise system to meet that competition. Certainly though, in such circumstances, the vertically imposed restrictions—absent price-fixing and in the presence of alternative products to meet the needs of the unfranchised—may not be held to be per se violations of Section 1.

It is significant that in the case at bar plaintiff makes no sale of book-sets to defendant or to any of its other licensees. It follows then that there cannot be any resale of this product by the defendant to its customers. The Revised Agreement calls upon the defendant to solicit orders through its branches and sublicensees, which said orders are then forwarded to Williams-West who reviews the order and sends it to Kemp Printing Company for printing and shipping. The shipment is made directly to the customer of the defendant and the customer pays plaintiff, not defendant, for the goods. Plaintiff therefore maintains dominion, control, and risks of loss over the product until it reaches the consumer. Such facts, absent price-fixing, do not fall within the definition of a per se violation of Section 1 contemplated by *Schwinn*.

I conclude also that the restraint involved here is reasonable within the confines of the various factors set forth in *Schwinn*.

### ILLEGAL TIE-IN ALLEGATIONS

Since 1947 the Supreme Court has held that tying arrangements are illegal per se. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The Court reasoned that tie-in served no purpose beyond the suppression of competition since they denied competitors free access to the tied product market and forced buyers to forego their free choice among

competitive products. Tie-ins are illegal under both Sherman § 1 and Clayton § 3. They are illegal under Sherman § 1 whenever (1) a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product, and, (2) a "not insubstantial" amount of interstate commerce is affected. Fortner Enterprises, Inc. v. U. S. Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Under Clayton § 3 it has been held that if either of the two Sherman § 1 conditions is present, a per se violation will be found. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277 (1953).

A tying arrangement has been defined by the Courts as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (tied) product, or at least agrees not to purchase that product from any other supplier. See Northern Pacific Railway v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

▬▬ Defendant contends there is evidence of an illegal tie-in with respect to the Revised Agreement. Defendant claims that plaintiff has forced Williams-East to accept something it does not want (a system of customer and territory allocations together with the payment to plaintiff) in order to get something that Williams-East does want (plaintiff's copyrighted record keeping books). It looks upon the record keeping book as the tying product and the business management services as the tied product.

Even defendant concedes that many people buy the plaintiff's books and do not buy business management services. (Defendant's Memorandum of Conten-

tions, page 92). There is simply no evidence that plaintiff required a person who bought its books to purchase management services. In many instances the sale of books is made to service station dealers who are situated too remotely to be called upon by those agents who administer the counseling service.

The Revised Agreement requires defendant as the exclusive representative of plaintiff, to conduct its operations in a confined area in order to maximize the benefits from the use of plaintiff's copyrighted publications and trade name. It does not require defendants to purchase any other product. Cf. Siegel v. Chicken Delight, Inc., 448 F.2d 43, 47 (9th Cir. 1971).

## COPYRIGHT ISSUE

Plaintiff claims that defendant Marcoin's publication of a record-keeping book for the BP Oil Company in 1972 infringed plaintiff's copyright on a record-keeping book which plaintiff printed in 1970 for the same oil company. Defendant denies infringement and puts in issue not only the validity of the BP copyright but all other of plaintiff's claimed copyrights on record-keeping books. It asks for a declaratory judgment of copyright invalidity.[5] Defendants state that the copyrights are invalid because, (1) blank record-keeping forms are not copyrightable, (2) plaintiff is not the author of the cover or forms, (3) the copyrights have lapsed or been voided, and (4) are void because of misuse.

Prior to the repudiation of the agreement by defendant it solicited BP, and Williams-West caused the book to be printed for the oil company at Kemp Printing Company. The pages carried plaintiff's copyright symbol. After the repudiation, defendant had its Marcoin Company solicit the order and had its

---

5. Each record-keeping book contains a cover (some having the logo of a particular oil company for distribution to its dealers), an instruction sheet, daily sheets and various forms for use as a monthly sales summary, purchase record, expense summary and profit and loss statement.

own printer prepare it. Here, there is both access and substantial, if not striking similarity between the two booksets. The cover, of course, is identical because it was prepared to BP's design. With some small rearrangement, the instructions are substantially identical. The sample daily sheet is so identical the defendants didn't bother to change the handwritten words and figures used to illustrate the plan. There is sufficient comparison between the arrangements of boxes and columns to show copying. Marcoin has not only used plaintiff's system but has used the same ruled lines and headings.

Plaintiff's BP Records and Profit Check contains text material intended to instruct the user in the proper manner in which to use the forms contained in the book. It thus conveys information. I conclude that plaintiff's work is properly the subject matter of copyright. Cash Dividend Check Corp. v. Davis, 247 F.2d 458 (9th Cir. 1957); Harcourt, Brace & World, Inc. v. Graphic Controls Corporation, 329 F.Supp. 517 (S.D.N.Y.1971). If Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1879) is still good law despite the great criticism of it found in texts and cases[6] it does not come to this defendant's aid.

Defendant's contentions of lack of authorship are also without merit. Plaintiff's copyrighted works are the result of revisions of previous books and the collective efforts and contributions of plaintiff's own employees and other persons who contributed without expectation of compensation and with no reservation of copyright by them in the work.

The protracted period of dispute between these parties has given rise to several transactional controversies having to do with the interpretation of the Revised Agreement. I have considered the contentions of each side regarding these disputes and reached the following findings:

1) Paragraph VII A of the Revised Agreement which mentions commissions due from plaintiff to defendant should be interpreted so that freight costs are deducted from defendant's commission. That same paragraph should be construed to mean that a commission is payable to defendant at such time as orders are actually purchased and funds are received by plaintiff. A guarantee to purchase is not a sale within the meaning of this paragraph until the oil company pays plaintiff for the remaining books. An exception to this must be made. I find that Mrs. Williams agreed to waive any contractual position she may have had as to Shell orders between December 1968 and February 28, 1972 and defendant is entitled to its commission on those orders if it has been paid by Shell.

2) Paragraph VII C "retail" price within the meaning of this paragraph is not the quantity discount or wholesale price charged to oil companies; rather it is the retail list price.

3) Paragraph VIII D "gross monthly revenue" as mentioned in this paragraph does not include the $4.00 monthly account fee on defendant's branch offices or the longevity discount.

4) I find against plaintiff on its claim for damages in the Eleventh Cause of Action for refusal to permit an audit.

5) I find that there are payments due from each party since the date each party began refusing to make reports and payments to the other. The parties shall confer and attempt to reach the appropriate figure and in the event they cannot arrive at a satisfactory agreement within 30 days of the filing of this order, each shall notify the Court of such fact and the Court reserves juris-

6. Nimmer on Copyright § 37; Mazer v. Stein, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954).

diction to appoint a Master at the expense of the parties to make such determination.

6) Because of the repudiation of the Revised Agreement by defendant, all rights to the east territory shall revert to plaintiff pursuant to Article XIII of the Revised Agreement. This is not intended to mean that defendants licensees and branch offices become licensees and branch offices of plaintiff but that plaintiff is free to develop the territory.

7) Plaintiff is entitled to damages for losing book orders, losing licensee commissions and incurring costs in its attempt to rebuild an eastern licensee organization to replace Williams-East. Plaintiff is further entitled to damages because of the breach by defendant of the terms of the Revised Agreement. Plaintiff is further entitled to damages from defendant by reason of defendant's infringement of plaintiff's copyrights. Damages for this item shall be assessed against all defendants.

■■■ While plaintiff is justified in asking damages in some sum for loss of profits during what it calls the expected additional 11 years life of the Revised Agreement, it is not entitled to the requested computation thereof. First, this is true because, like many divorce cases (and the caption of this cause suggests one) there is no completely innocent party. Both parties' conduct prior to February 1972 was such as would strain at cordial business relations, but defendant's open repudiation during that month was inexcusable and not caused by any conduct on the part of plaintiff. Rather, it was the placing in operation of a long-wished-for severance on the part of defendant Williams-East, all under the guidance of Marcoin. Secondly, as we look today at this petroleum oriented business caught in the center of an energy crunch, there is no assurance that the next few years will see the number of viable service stations that have dotted our geography in the past. It would seem fair to use a two-year period in estimating future losses to plaintiff in the east area until it has geared its forces to become a competitive factor there.

PLAINTIFF'S DAMAGES

| Lost Book Sales | |
|---|---|
| 2–1–72 to 9–30–72 | $ 71,104.00 |
| 10–1–72 to 9–30–73 | 92,407,00 |
| Loss of Licensee Commissions | |
| 1972 | 92,362.19 |
| 1973 | 91,506.97 |
| Two years projection (discounted) | 160,000.00 |
| Loss of Good Will | |
| Two years computation | 30,000.00 |
| Costs Incurred in Setting Up East Area | |
| Estimated | 85,000.00 |
| Copyright Infringement | |
| Loss on March 72 to B.P. Sale (Defendant's Profit figure used) | 6,212.00 |
| TOTAL | $628,592.16 |

Plaintiff is further entitled to a permanent injunction enjoining defendants or any of them, their agents, servants and employees, and all persons acting under, in concert with, or for them, from using the name Edwin K. Williams and Company or any variation thereof, or the Edwin K. Williams logo, or the trade names "Profit Guide," "Quick Sales Recorder," "Profit Analyzer" and "Serv-A-Station, Inc." Defendants are further enjoined from representing in any way or manner that defendants are a representative or agent of plaintiff and are further enjoined from infringing any of the copyrights of plaintiff litigated in this action and are required to deliver up for destruction all plates, molds and other matter for making such infringing copies.

The parties shall compute the damages to which defendants are entitled and the same shall become set-off as against plaintiff's damages. Pursuant to Rule 52(a) of Federal Rules of Civil Procedure this memorandum shall constitute the findings of this Court. Plaintiff shall prepare a form of judgment.