542 F.2d 1053
 191 U.S.P.Q. 563, 1976-2 Trade Cases 61,077
 EDWIN K. WILLIAMS & CO., INC., a California Corporation,
Plaintiff-Appellee and Cross-Appellant,
v.
EDWIN K. WILLIAMS & CO.-EAST, a Virginia Corporation, and
Marcoin, Inc., a Virginia Corporation,
Defendants-Appellants.
EDWIN K. WILLIAMS & CO.-EAST, INC., Plaintiff on the
Counterclaims-Appellant,
v.
EDWIN K. WILLIAMS & CO., INC., Defendant on the Counterclaims-Appellee,
and
Kemp Printing Co. and Mrs. E. K. Williams, Additional
Defendants on the Counterclaims-Appellees.
 Nos. 74-2449, 74-1998.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 31, 1976.
Rehearing and Rehearing En Banc Denied Nov. 17, 1976.
 
 Donald C. Smaltz and Harlan P. Huebner (both argued), Los Angeles, Cal., for appellant in 74-2449 and for appellee in 74-1998.
 Raymond C. Fisher (argued), Los Angeles, Cal., for appellants in 74-1998 and for appellee in 74-2449.OPINION
 Before WRIGHT and CHOY, Circuit Judges, and SOLOMON, District Judge.*
 SOLOMON, Judge.
 
 
 1
 Defendants appeal from judgments for $586,781.51 and $6,212.00 in favor of the plaintiff based on breach of contract and copyright infringement.[1] The plaintiff cross-appeals.
 
 
 2
 Defendants, appellants here, are Edwin K. Williams & Co.-East (East) and Marcoin, Inc., two Virginia corporations. East is the wholly-owned subsidiary of Marcoin.
 
 
 3
 Plaintiff, appellee here, is Edwin K. Williams & Co., Inc. (West), a California corporation. Mrs. E. K. Williams, president of West, and Kemp Printing Co. (Kemp), West's printing affiliate, are defendants on the counterclaims.
 
 
 4
 Beginning in 1935, Edwin K. Williams designed and sold record-keeping books to gasoline service station dealers in California. He also showed the dealers how to keep their books.
 
 
 5
 In 1946, Williams and Fred G. Harris formed Edwin K. Williams & Co. Williams owned 75 per cent[2] and Harris owned 25 per cent. Williams and Harris formed a subsidiary of Edwin K. Williams & Co. called "Serv-A-Station" to provide a bookkeeping service to gasoline service station dealers. Harris became president of Serv-A-Station.[3]
 
 
 6
 In 1949, Williams bought Harris's interest for $10,000, payable at $100 a month. Thereafter, for a short time Harris provided bookkeeping and counseling services to a few stations around Los Angeles. He then joined the Navy, and served in Washington, D. C., during the Korean War.
 
 
 7
 In July 1952, when Williams still owed Harris $5,300, they entered into an agreement (the 1952 Agreement). Harris's attorney drafted this 1952 Agreement, which was the predecessor of the agreement at issue in this action. The draftsmanship of the 1952 Agreement was not a model of clarity. The district court characterized the relationship created by the agreement as a license.
 
 
 8
 In the agreement, Harris was the "First Party", and Williams, West, and Serv-A-Station were the "Second Party". The agreement recited that:
 
 
 9
 ". . . Second Party does hereby grant, bargain and sell unto First Party the exclusive right, title and interest to sell, market and promote all book-keeping systems, forms, books and methods under said names (including "Williams"), which now are used . . . or which hereafter are developed by Second Party . . . for all states east of the Mississippi River (with details and exceptions) . . . and thence north through Canada . . . ."
 
 
 10
 The 1952 Agreement gave Harris the right to set up licensees on the bookkeeping service, ". . . the same as is being done by Serv-A-Station, Inc. on the west coast." Harris was to give Williams 30 per cent of all revenues from the bookkeeping service, except for licensing fees, which Harris was to retain.
 
 
 11
 Harris's book customers were to send their orders and payments to West in California, and Harris would receive a 30 per cent commission less freight.
 
 
 12
 Williams conveyed to Harris all his "accounts, goodwill and contracts" in the eastern territory, and Harris agreed to use his best efforts to develop the territory. The agreement characterized Harris in various ways as an "independent proprietor", as an "independent contractor" in the eastern territory, and as "the exclusive proprietor and sales organizer for the territory".
 
 
 13
 The 1952 Agreement did not provide for any controls on Harris's use of the rights he acquired. It set no time limit on that use, nor did it specify the consequences of misuse. There was no provision in the contract which gave West any rights in the eastern territory.
 
 
 14
 This 1952 Agreement, with modifications,[4] served until 1968. Williams licensed other regional representatives in the Northwest (1953), South Central (1955), North Central (1959), and Rocky Mountain territories (1961). Williams himself was responsible for the Southwest, and Harris was responsible for the East. In 1963, when Williams died, his widow, Mrs. E. K. Williams, became president of West.
 
 
 15
 Although Williams and Harris prospered under the 1952 Agreement, their relations were not cordial. The district court noted, ". . . the sublimated rivalry between Williams and Harris and the determination of each to maintain a posture of superiority over the other. Needless to say, there were many business disputes . . . ." 377 F.Supp. at 421. This rivalry continued after Mrs. Williams took over West.
 
 
 16
 Both West and East took orders for West's record-keeping books, and both provided bookkeeping services. Beginning in 1966, East also presented seminars for oil company employees and gasoline service station dealers.
 
 
 17
 In 1968, Harris attempted to hold a seminar in California, outside the eastern territory. West objected and filed an action in the United States District Court for the Northern District of California. West alleged tradename and copyright infringement and claimed unpaid credits from East. West and East negotiated a settlement, which included a "Revised Agreement" to replace the 1952 Agreement.
 
 
 18
 The 1968 Revised Agreement is the basis for this action and is the contract which West charges that East breached.
 
 
 19
 The 1968 Revised Agreement terminated and superseded the 1952 Agreement. Each party abandoned all prior rights under the 1952 Agreement and its modifications. California law was to govern.
 
 
 20
 The Revised Agreement provided for a transfer of rights:
 
 
 21
 "Subject to the terms hereof, Williams (West) irrevocably grants in perpetuity to Williams-East exclusive rights to the Operation (elsewhere defined to 'include all of the activities of Williams, territorial rights to which were heretofore granted to Williams-East and which are confirmed in this Revised Agreement . . .') in the (eastern) Territory, said rights to include an exclusive license within the Territory to all present and future copyrighted material to which Williams is the proprietor."
 
 
 22
 East was required to use the Williams name in the eastern territory for all its activities within the petroleum marketing industry. If East went into business outside that industry, it was required to use a name other than Williams.
 
 
 23
 West and East agreed to cooperate and to promote business and goodwill for each other, to exchange copyrights freely, and not to contest each other's copyrights.
 
 
 24
 West and East also agreed to include seminars within the territorial restrictions. Although in 1968 West did not offer seminars, the Revised Agreement provided that each could inspect the other's seminar materials. Each was entitled to be present if the other called on the headquarters of an oil company located in the first's territory.
 
 
 25
 Nevertheless, they asserted their mutual independence; they disclaimed a relationship of joint venture, partnership, or agency; and they provided for the termination of their relationship. If East failed to make any payment, West could terminate the Revised Agreement on 60 days' notice and all rights to the eastern territory would revert to West 120 days later. If East became bankrupt, West could terminate "forthwith".
 
 
 26
 The 1968 Revised Agreement provided for the continuance of the business of the parties as before, except that now East was required, not merely permitted, to use the Williams name in the eastern territory.
 
 
 27
 In book sales, West maintained representatives throughout the United States.[5] East was its representative only in the eastern part of the country. The representatives solicited book orders primarily from oil companies in their territories and forwarded the orders to West. Kemp, West's printing affiliate, printed the books and sent them directly to the oil companies. The representatives received commissions of one to seven per cent, except that East received a commission of 30 per cent less freight. Each service station dealer used about $20 in books a year.
 
 
 28
 Oftentimes oil companies, instead of buying the books directly, merely recommended them to their dealers, or guaranteed to West that a specified number of dealers would buy the books. All the representatives solicited these recommendations and guarantees. Their commissions were based on the number of books shipped to dealers in their territories.
 
 
 29
 The book-sales business remained essentially the same from its beginning in 1935, except that, in later years, more books were sold to oil companies and less were sold to dealers directly.
 
 
 30
 In the bookkeeping service, West maintained licensees throughout the United States. East was the licensee in the eastern territory. West's licensees visited service station dealers twice a month. On the first visit, the dealer turned over his records; and on the second, he received a detailed account of his profit and loss as well as his inventory. The dealer also received tax advice and general business counseling. The service cost $60 a month.
 
 
 31
 In the eastern territory, East offered the service through its own sublicensees and branch offices. The dealers paid East directly, and East passed on a 30 per cent commission to West. West's licensees in other territories paid West commissions of 30 to 60 per cent.
 
 
 32
 The bookkeeping service remained essentially the same, but in later years both the content and the techniques became more sophisticated.
 
 
 33
 The seminars were introduced by East in 1966. After the 1968 Revised Agreement was signed, West furnished seminars through a subsidiary, EKW Management Institute. West and East were not required to, nor did they, exchange money or materials on the seminars, but West contends that it occasionally referred requests for seminars in the eastern territory to East. Each of the seminars lasted a few days and cost about $200 for each participant.
 
 
 34
 The three businesses were closely related. Dealers who used the bookkeeping service were encouraged, though not required, to use the Williams books. Oil companies which bought the books often encouraged their dealers to buy the bookkeeping service. The seminars of both West and East made use of the books and of information acquired while providing the bookkeeping service. The seminars showed dealers and oil company personnel how to use the books and the service to better advantage.
 
 
 35
 Both West and East used the interrelationship of the products and services as a sales point. They presented themselves as experts in record-keeping and financial counseling at all levels of the petroleum marketing industry.
 
 
 36
 In 1968 or 1969, the principal shareholders and officers of East formed Marcoin, Inc., to handle East's non-oil business.[6] Following a one-for-one stock transfer, Marcoin owned 100 per cent of East. Marcoin's officers and board of directors were substantially identical to East's.
 
 
 37
 By 1970, two years after they signed the Revised Agreement, West and East refused to account to each other. West filed an action in a California state court for a declaratory judgment interpreting the Revised Agreement and for specific performance, injunctive relief, and an accounting. It also sought damages for breach of contract and unfair competition.
 
 
 38
 East removed the case to the United States District Court for the Central District of California. In its amended answer, East contended that the Revised Agreement violated sections 1 and 2 of the Sherman Anti-Trust Act (15 U.S.C. §§ 1 and 2) because it:
 
 
 39
 allocated territories and customers between actual or potential competitors;
 
 
 40
 tied the territorial and customer restrictions on books to similar restrictions on the bookkeeping service and the seminars; and
 
 
 41
 provided for price-fixing.
 
 
 42
 East also counterclaimed against West, Kemp Printing, and Mrs. Williams, alleging that:
 
 
 43
 all of West's copyrights are invalid;
 
 
 44
 West used the copyrights to monopolize and (with Kemp and Mrs. Williams) to conspire to monopolize;
 
 
 45
 West used the copyrights as part of a tying arrangement with the bookkeeping service and the seminars; and
 
 
 46
 East could and would compete with West but for the Revised Agreement.
 
 
 47
 Between April 1971 and January 1972, West and East conducted settlement negotiations, and during that time they stipulated to abide by their respective interpretations of the Revised Agreement.
 
 
 48
 In February 1972, shortly after the stipulation expired, East, without notifying West, repudiated the Revised Agreement. East printed several thousand record-keeping books for the BP oil company with the name "Williams Printing Company" displayed as the printer. "Williams Printing Company", of Atlanta, Georgia, bore no relation to West.
 
 
 49
 After the repudiation, West and East each tried to retain their own licensees and to persuade the other's licensees to switch their allegiance. Each company acquired new licensees in the other's territory.
 
 
 50
 In June 1972, West filed a supplemental complaint which named East and Marcoin as defendants. West sought damages and injunctive relief for breach of the Revised Agreement, interference with contractual and business relations, copyright infringement on the BP record-keeping book, tradename infringement, unfair competition, and false designation of origin.
 
 
 51
 In its answer to the supplemental complaint, East[7] contended that West in 1952 sold its rights to the Williams name in the eastern territory, and if West had ever licensed the name to East, that license was abandoned when West failed to exercise sufficient control over the quality of the goods and services that East provided under the Williams name.
 
 
 52
 In November 1972, on West's motion, the district court preliminarily enjoined East and Marcoin from using the tradename Williams.
 
 
 53
 The case was tried to the court from January 2 to February 19, 1974. There were 18 witnesses, 16 depositions, and several thousand pages of exhibits. There are 3,659 pages of pleadings and 4,912 pages of testimony.
 
 In its opinion, the court held that:
 
 54
 West's copyrights were valid, and the copyright on the BP book was infringed;the restrictions of the Revised Agreement were ". . . reasonable steps taken to implement a valid copyright licensing system . . .";
 
 
 55
 the 1952 and 1968 agreements were valid tradename licenses;
 
 
 56
 there was no illegal tying;
 
 
 57
 East and West were neither actual nor potential competitors; and
 
 
 58
 East breached the Revised Agreement, infringed West's tradenames, and committed unfair competition.
 
 
 59
 The district court dismissed East's claim of interference with contractual relations and permanently enjoined East and Marcoin from using the tradename Williams, from representing that they were associated with Williams, and from infringing West's copyrights. The court entered judgment for $586,721.51 against East and $6,212.00 against Marcoin and East.
 
 
 60
 East and Marcoin appealed, asserting numerous errors. West cross-appealed, asserting that the judgment for $586,721.51 should run also against Marcoin.
 
 
 61
 The essential basis for East's appeal is that the district court erroneously characterized the relationship between East and West as that of a licensee and licensor in both tradenames and copyrights.
 
 
 62
 East contends that it was an actual or potential competitor of West.
 
 The Tradename License
 
 63
 The 1952 Agreement did not convey all of West's interest in its tradenames. It conveyed only the limited right to use the names in the eastern territory in sales of various products and services within the petroleum marketing industry for as long as East used its best efforts and complied with the provisions of the contract.
 
 
 64
 We agree with the district court that the words "grant, bargain, and sell" used in the 1952 Agreement, which are ordinarily associated with a sale, were used here to convey to East only the limited right to do business in the Eastern territory under West's tradenames. See Jones v. Pepsi-Cola Co., 223 F.Supp. 650, 653 (D.Neb.1963).
 
 
 65
 Here, the parties intended to maintain an ongoing relationship when they executed the 1952 Agreement. East's concession that the 1968 Revised Agreement essentially renewed the terms of the 1952 Agreement supports the court's finding that the parties in 1952 intended to create a licensing relationship. One can renew a license but not a sale. If the parties had made a sale in 1952, there would have been no need to renew it in 1968.
 
 
 66
 The court properly found that the relationship between East and West was that of a tradename licensee and licensor.[8]
 
 
 67
 East next contends that even if the 1952 Agreement was a license, West misused its tradenames because it failed to exert sufficient control over East's performance of the bookkeeping service. A tradename licensor must maintain control over the quality of the finished product or service to guarantee to the public that the goods or services are of the same, pre-license quality. Siegel v. Chicken Delight, Inc., 448 F.2d 43, 51 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).
 
 
 68
 Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof. American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963).
 
 
 69
 The major purpose of quality control is to protect the public. Here, Williams knew in 1952 that Harris was competent and also well-acquainted with the bookkeeping service;[9] he would present no danger to the public. Harris's customers, service station dealers, received a highly personalized service on a regular, ongoing basis; they could test whether the service benefitted them or whether they should seek additional or different service. This was not a case in which a licensor's failure to exert proper quality control over a careless licensee might lead an ordinary, unsuspecting customer to make an isolated purchase of contaminated food or a dangerously defective product. Cf. Siegel v. Chicken Delight, supra; Dawn Donut Co. v. Hart's Food Stores, 267 F.2d 358 (2d Cir. 1959).
 
 
 70
 West maintained close financial control over East in both the 1952 and 1968 Agreements. The 1968 Revised Agreement required East to use the Williams name, and limited East's use of it to the retail petroleum marketing industry. These controls were significant in view of Harris's independent personality and resistance to supervision. A licensee like Harris should not be permitted to resist quality control and then assert lack of quality control to invalidate a tradename license.
 
 
 71
 The amount of control required varies with the circumstances. All of these circumstances, considered together, support the district court's finding that there was sufficient quality control to sustain the tradename license.
 
 The Copyright License
 
 72
 The district court held that West's copyrights on its account books were valid and that East's book "BP Records and Profit Check" infringed West's book of the same name. We agree.
 
 
 73
 The infringed book is typical of West's account books. It contains several pages of instructions. These instructions both precede and follow 31 pages of blank forms one page for each day of the month. The dealer fills in the day's transactions in the various boxes on the blank forms.
 
 
 74
 Some of the instructions show the dealer how to fill in the forms.[10] Other instructions show the dealer how to operate his business.
 
 
 75
 One page of instructions, entitled "Monthly Sales Summary Explanation", begins by advising the dealer to first learn " . . . how much its costs you to open the door every morning . . . ." It shows the dealer how to calculate his overhead (listing "Wages, Rent, Supplies, Taxes . . . " and ten other items), his other money needs ("Loan Payment, Equipment Note Payment, Service Truck Payment . . . ") and his daily "break even point". It advises that: "Successful dealers shoot for a 25% to 30% gross profit on total retail sales".
 
 
 76
 The instructions emphasize the importance of "balanced sales" and estimate how many dollars' worth of motor oil, tires, batteries, accessories, and other items a dealer should try to sell for every 1,000 gallons of gasoline. They also set forth optimum profit margins on these items, ranging from 20 per cent to 25 per cent on tires to 100 per cent on lubrication and labor. They conclude with tips on keeping regular records and using incentives to motivate employees: "Make a game out of seeing how early each day you and your men can sell enough to cover the Daily Operating Expense."
 
 
 77
 All of this information is carefully explained in step-by-step procedures under such headings as "What Successful Dealers Say" and "Know All Your Expenses". East's version of this page was pirated verbatim, except that East deleted West's copyright notice and the word "Monthly" from the title.
 
 
 78
 The district court recognized that Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1879), held that blank accounting books are not subject to copyright protection. The Copyright Office has interpreted Baker v. Selden to prohibit copyright protection to:
 
 
 79
 " . . . Blank forms, such as time cards, graph paper, account books, . . . and the like, which are designed for recording information and do not in themselves convey information." 37 C.F.R. § 202.1(c) (1959).
 
 
 80
 The district court found that West's copyrights were valid because the books conveyed information. We agree. In our view, the instructions and the blank forms constituted an integrated work entitled to copyright protection.
 
 
 81
 East also contends that the copyrights were invalid because: West was not the author or proprietor of the works; some of the copyrights were not properly renewed; and West took out new copyrights on only slightly altered old works, thereby effectively perpetuating their copyrights. East presented no credible evidence to support any of these contentions.
 
 
 82
 The district court found that East infringed West's copyright on the "BP Records and Profit Check". East's version merely rearranged and rephrased some of the introductory instructions. Otherwise East's version was almost identical to West's. We concur in the district court's holding that East was guilty of infringement.
 
 The Antitrust Contentions
 
 83
 (a) Territorial Allocations
 
 
 84
 East contends that the 1952 and 1968 agreements divided the country into territories between actual and potential competitors, and were therefore per se violations of the antitrust laws.
 
 
 85
 We have already rejected the basis for this contention, namely, that the 1952 Agreement was a sale, not a license.
 
 
 86
 East was a potential competitor of West in 1952, before the agreement was signed. But East exchanged its right to compete with West for an exclusive sales agency in books and a tradename license in the bookkeeping service. East reaffirmed that bargain in the 1968 Revised Agreement.
 
 
 87
 Only in seminars can West and East be considered potential competitors. Seminars were neither mentioned nor contemplated in the 1952 Agreement. They were first developed and marketed by East beginning in 1966, and were an outgrowth of the sale of books and the bookkeeping service. It would have been awkward and confusing for West and East to have competed in seminars at the same time they were in a licensing and agency arrangement in closely related activities.
 
 
 88
 The territorial restrictions on seminars in the 1968 Revised Agreement were reasonable restraints ancillary to West's primary, legitimate purpose of protecting its tradenames and copyrights. If the primary purpose is legitimate, ancillary restraints which are reasonable may be permitted. United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); United States v. Columbia Pictures Corp., 189 F.Supp. 153, 178 (S.D.N.Y.1960).
 
 
 89
 The territorial restrictions on seminars do not violate the antitrust laws.
 
 
 90
 (b) The Schwinn Issues
 
 
 91
 East contends that, even if the relationship was vertical, West violated both the per se test and the rule of reason test of United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Under Schwinn, " . . . where a manufacturer sells products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results." 388 U.S. at 379, 87 S.Ct. at 1865 (emphasis in original). But where the distributor is effectively an agent or salesman and " . . . (w)here the manufacturer retains title, dominion, and risk with respect to the product . . . it is only if the impact of the confinement is 'unreasonably' restrictive of competition that a violation of § 1 (of the Sherman Act) results . . . ." 388 U.S. at 380, 87 S.Ct. at 1866.
 
 
 92
 The tests of Schwinn were designed to apply when a manufacturer transfers a product to his distributor or his retailer, by sale, consignment, or agency.
 
 
 93
 Here there was only one product, the account books. The tests of Schwinn do not apply to the books, because East did not have possession of the books, except in isolated instances. West shipped the books directly to the customers, who paid West. East merely took orders for the books, and, after the books were paid for, received commissions from West.
 
 
 94
 Nor do Schwinn's concepts of "title, dominion, and risk" apply to services like the bookkeeping service and the seminars. In those services, West transferred tradename licenses to East. A sale under Schwinn must be made "with no strings attached"; a tradename license requires that the licensor retain "strings", that is, the title to his name and some dominion and risk over what he does transfer his reputation.
 
 
 95
 Schwinn does not apply here.
 
 Damages
 
 96
 East contends that the district court erred when it awarded damages to West for breach of contract. It makes several contentions, two of which merit brief discussion.
 
 
 97
 East contends that the district court erroneously awarded West its anticipated gross profits instead of its anticipated net profits on lost book sales. Lost profits in the eastern territory were calculated by deducting two items from West's anticipated gross revenues: East's commission of 30 per cent and the cost of printing the books. East presented no credible evidence that West's overhead was reduced. Damages may be awarded on the basis of gross profits when the breach does not significantly reduce overhead. Buono Sales, Inc. v. Chrysler Motors Corp., 449 F.2d 715, 719-720 (3rd Cir. 1971). On this record, we cannot say that the award based on gross profits was clearly erroneous.
 
 
 98
 East also contends that the district court erred when it did not deduct West's post-repudiation revenues in the eastern territory from the award of damages to West for its lost licensee commissions. West claimed costs of about $215,000 in rebuilding its eastern licensing organization. East contends that West received revenues of about $130,000 from these operations. The district court must have taken these revenues into account, because it awarded West only $85,000 in damages on this issue.
 
 
 99
 We find no error in the court's award of damages.
 
 Additional Contentions
 
 100
 The district court patiently considered the scores of contentions and the thousands of pages of pleadings, testimony and exhibits. Much of the evidence was not addressed to the real issues. We believe that the district court, in its thorough and detailed opinion, reached those issues and, with a single exception discussed in the next section, decided them correctly.
 
 
 101
 In this court appellants assert many errors. They clothe these assertions in the language of vituperation, directed primarily, though not exclusively, at the district court and its opinion.
 
 
 102
 We do not commend this tactic.
 
 
 103
 We have considered all of the appellants' contentions, and we have discussed most of them. There are others, on damages, on evidentiary rulings, and on the absence of explicit findings on certain issues. We have not discussed them because they lack merit.
 
 West's Cross-Appeal
 
 104
 West filed a cross-appeal in which it seeks to have the judgment below against East also entered against Marcoin.
 
 
 105
 The principal shareholders of East Harris, McFadden, and Talmage created Marcoin in 1968 or 1969 to handle East's non-oil business. Later Marcoin acquired all of East's stock by giving East's shareholders Marcoin stock on a one-for-one exchange.
 
 
 106
 The directors and officers of the two corporations significantly overlapped. Harris, McFadden, and Talmage were directors, members of the executive committee, and the three highest-ranking officers of both corporations.
 
 
 107
 East and Marcoin operated out of the same offices in Virginia. After East in 1972 repudiated the 1968 Revised Agreement, most of its employees became employees of Marcoin with the same duties and titles. Customers who asked were told that the change from "East" to "Marcoin" was a change in name only. The business of East was transferred to Marcoin without any formal action by the boards of directors or the executive committees of either corporation.
 
 
 108
 In 1969 and 1970, East accounted for 90 to 95 per cent of Marcoin's revenues: 2.7 million dollars out of 2.8 million in 1969, and 3.3 million out of 3.6 million in 1970.
 
 
 109
 Marcoin and East profited from the industry-wide confusion[11] that surrounded the repudiation of the Revised Agreement and the subsequent corporate takeover of East by Marcoin. The evidence showed that West lost revenues on book orders in early 1972 from at least three oil companies Sun, BP, and Texaco because of the deception of Marcoin and East. The confusion caused hardship as well. East's sublicensees were forced to choose between staying with the East organization or staying with the Williams name, which they had helped develop.
 
 
 110
 West contends that Marcoin's actions left East an empty shell without resources to satisfy the judgment against East.
 
 
 111
 The district court did not make full findings on this issue, although it did find that East's repudiation in 1972 " . . . was inexcusable and not caused by any conduct on the part of plaintiff (West). Rather, it was the placing in operation of a long-wished-for severance on the part of defendant Williams East, all under the guidance of Marcoin." 377 F.Supp. at 429 (emphasis supplied).
 
 
 112
 There are no inflexible tests by which courts determine when to hold corporations liable for the acts of their subsidiaries.[12] Generally, the corporate separateness is respected unless " . . . to do so would work an injustice upon innocent third parties." Fidelity & Deposit Co. of Maryland v. Usaform Hail Pool, Inc., 523 F.2d 744, 758 (5th Cir. 1975). But each case must be considered on its own facts. Courts have developed various checklists of relevant questions, which have been summarized by one commentator as follows: whether the transactions, employees, and accounts of the two corporations were intermingled; whether the corporations disregarded the procedural formalities of separateness; whether the two corporations represented themselves to the public as one; whether the later-formed corporation was adequately financed; and whether the later-formed corporation acted not for its own benefit but for the benefit of the first-formed corporation. Henn on Corporations § 148 (2d ed. 1970). Courts generally consider other factors, such as whether the two corporations have common stock ownership and common officers and directors. See Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 161 (7th Cir. 1963). For a thorough discussion of all relevant factors see 38 A.L.R.3d 1102 (1971) and 7 A.L.R.3d 1343 (1966).
 
 
 113
 There was practically no dispute on the evidence. It showed that, between East and Marcoin, there was an intermingling of transactions and employees; a disregard of the formal separateness of the two corporations; common stock ownership and common directors and officers; a transfer of most of the assets and business to the later-formed corporation; representations to the public of a single identity; and, most important, moral culpability and the threat of injustice.
 
 
 114
 In our view, the district court erred as a matter of law in not finding that Marcoin and East should be treated as one entity. The case is remanded for entry of judgment against Marcoin as well as East. In all other respects, the judgment is affirmed.
 
 
 
 *
 Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The trial court's opinion is reported at 377 F.Supp. 418
 
 
 [2]
 For a short time, one other person owned a five per cent interest which Williams acquired
 
 
 [3]
 The bookkeeping service eventually became a management consultant service. Although West and East later called this activity "business management services" or "BMS", it remained essentially a bookkeeping service
 
 
 [4]
 For example, in 1956 Harris reconveyed his interest in the Canadian territory to Williams in return for Louisiana
 
 
 [5]
 In both books and the bookkeeping service, West maintained an international operation not relevant to this action
 
 
 [6]
 Marcoin sold insurance to service station dealers, offered an escrow service, and temporarily operated stations which were being transferred from one franchisee to another
 
 
 [7]
 Hereafter, unless otherwise noted, "East" includes Marcoin
 
 
 [8]
 In book sales, East does not dispute that it was West's agent
 
 
 [9]
 East contends that Harris invented the bookkeeping service
 
 
 [10]
 A typical paragraph entitled "STAMP CONTROL PROMOTION (Bottom of Daily Sheet)", reads:
 "This section offers an easy method of accounting for Stamps or Promotion Items. Opposite Open Inventory enter the Close Inventory from the previous day. Opposite Addition enter any purchases for the day. Total Open Inventory and Addition and enter opposite Total. Subtract Close Inventory at end of day and enter results opposite Gone."
 
 
 [11]
 For example, one trade publication reported that "The Edwin K. Williams & Company, well known around these parts . . . , has been taken over by the Marcoin Management Service. . . . It is a nationwide organization and we expect they will be calling on you before long." The phrase "these parts" referred to Minnesota, which had been in West's territory
 
 
 [12]
 The fact that here the subsidiary (East) created the parent (Marcoin) is unusual, but it does not affect the analysis