

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-2006

# Doeblers PA Hybrids v. Doebler

Precedential or Non-Precedential: Precedential

Docket No. 04-3848

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Doeblers PA Hybrids v. Doebler" (2006). *2006 Decisions.* Paper 1339.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1339

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3848

———

DOEBLERS' PENNSYLVANIA HYBRIDS, INC.

v.

TAYLOR DOEBLER, III, an individual;
DOEBLER SEEDS LLC d/b/a T.A. Doebler Seeds,

Defendants/Third-Party Plaintiffs

v.

WILLARD L. JONES;
WILLIAM R. CAMERER, III,

Third-Party Defendants

Taylor Doebler, III, an individual, and
Doebler Seeds LLC d/b/a T.A. Doebler Seeds,

Appellants

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 03-cv-01079)
District Judge: Honorable James F. McClure, Jr.

Argued June 30, 2005
Before: NYGAARD,[*] SMITH, and FISHER, *Circuit Judges*.

(Filed March 23, 2006 )

Rees Griffiths
Barley Snyder
100 East Market Street
P.O. Box 15012
York, PA  17405

John G. Harkins, Jr. (Argued)
Steven A. Reed
Harkins Cunningham
2005 Market Street
2800 One Commerce Square
Philadelphia, PA  19103
        *Attorneys for Appellants*

_____

[*]Judge Richard L. Nygaard assumed senior status on July 9, 2005.

Lewis F. Gould, Jr.
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA  19103-4196

Samuel W. Apicelli
Duane Morris
305 North Front Street, 5th Floor
P.O. Box 1003
Harrisburg, PA  17108-1003

Jams J. Kutz (Argued)
Post & Schell
17 North 2nd Street, 12th Floor
Harrisburg, PA  17101
        *Attorneys for Appellee, Doeblers'*
        *Pennsylvania Hybrids, Inc.*

Stephen Moniak
Thomas G. Collins
Buchanan Ingersoll
213 Market Street
One South Market Square, 3rd Floor
Harrisburg, PA  17101
        *Attorneys for Appellees, Willard L. Jones*
        *and William R. Camerer, III*

## OPINION OF THE COURT

FISHER, *Circuit Judge*.

In this interlocutory appeal between corn-seed businesses owned by relatives of the founder of the original business, we are asked who owns the founder's surname, Doebler, as a trademark. We are also asked whether defendants – the founder's grandson and his business – have engaged in trademark infringement, trade secret misappropriation, and various other torts and fiduciary breaches. The District Court, concluding that defendants engaged in those activities as a matter of law, granted summary judgment to plaintiff and entered a permanent injunction in its favor. Because we conclude that plaintiff has not met its burden of showing that it is entitled to judgment as a matter of law, we will reverse and remand for further proceedings.

## I.

Even the closest of families may battle, but when such a feud occurs against the backdrop of family businesses – here, dueling companies that trace their ancestry to one defendant's grandfather – the stakes include critical business assets. Although the personal aspects of this dispute are not material to our resolution of this appeal, the history of the Doebler family businesses is critical to this matter, a case that is now before us for a second time.

4

## A. The Doebler Family Members and Their Businesses

Taylor A. Doebler, Sr. ("Doebler I") started the family seed corn business in the 1930s doing business as T.A. Doebler. In the early 1950s, his son Taylor A. Doebler, Jr. ("Doebler II") joined the business, which became a partnership under the name of T.A. Doebler & Son ("Partnership"). For many years, the Partnership used the "Doebler" surname as a trademark in selling corn seed. Doebler I died in 1981. In the 1990s, Doebler II's son, Taylor A. Doebler, III ("Doebler III"), joined the Partnership.

Other family members were involved in the business as well, and on several occasions, Doebler II formed additional entities. In December of 1972, Doebler II formed plaintiff Doeblers' Pennsylvania Hybrids, Inc. ("Hybrids"), to handle sales and distribution. In addition to Doebler II, the incorporators included his son-in-law Willard L. Jones, and his nephew William R. Camerer, III. The vast majority of the initial stock belonged to Doebler II, though Camerer and Jones owned a small amount of stock. All three families were represented on Hybrids' board of directors as well. Currently, Jones and Camerer are officers, directors, and shareholders in Hybrids. Prior to the events directly leading to the present suit, the stock owned by Jones and Camerer increased to approximately 36% each.

In 1986, Doebler II formed another entity, Doebler Farmland, Inc. ("Farmland"). Doebler II transferred land to Farmland, which in turn leased the property back to Partnership

5

to grow seeds.  As of 2003, Doebler III and his two sisters collectively owned the majority of Farmland stock, with nearly all the remainder belonging to Jones, Camerer, and various other members of the Jones and Camerer families.  Thus, the Partnership's original functions were ultimately split between Partnership, Hybrids, and Farmland.

Before his relationship with Camerer and Jones soured, Doebler III had ties to all three entities: he was partnered with his father in the Partnership and remains an owner of the successor LLC; he is co-owner of Farmland; and he was – but no longer is – a shareholder, director, and secretary/treasurer of Hybrids.  After his father's death in 2002 and as part of the events leading to this lawsuit, Doebler III reorganized Partnership as a limited liability company, Doebler Seeds, LLC, d/b/a T.A. Doebler Seeds ("LLC").

In contrast, at no point did Camerer or Jones ever have any ownership interest in the Partnership or its successor LLC. They are, however, shareholders and directors of Hybrids and have served as officers in varying capacities.[1]  Jones eventually succeeded Doebler II as Hybrids president.  Camerer served as vice-president until he was removed in 2000 due to alleged misconduct.  Ironically, as noted below, Camerer succeeded Jones as president in 2002.  Camerer is also the owner and

---

[1]They also own some stock in Farmland.

6

president of another entity, Camerer Farms, Inc. ("Camerer Farms"), a farm that produces corn seed also sold by Hybrids.[2]

## B.  The DOEBLER Name

The Doebler name has been used as a trademark in connection with corn seed in marks such as DOEBLER'S PENNSYLVANIA HYBRIDS.  In addition, the formative DOEBLER has been used by T.A. Doebler & Son, Doeblers' Pennsylvania Hybrids, Inc., and Doebler Farmland, Inc. as part of their corporate and various trade names such as Doebler's Hybrids.  Hybrids also registered the names "Doebler's, Inc." and "Doebler's Hybrids, Inc." in Pennsylvania as fictitious names.

The parties agree that Partnership used the DOEBLER name at least until the formation of Hybrids at the end of 1972. See Appellee Br. At 8 ("[Partnership] continued up until 1972 to cultivate, improve and sell agricultural seed products within Pennsylvania, contracting with farmers to grow seeds which it would market and sell under its name.").  The parties vigorously contest, however, who used and owned the name after that point. Interestingly, upon Hybrids' formation, the following ad or press release was issued:

---

[2]In addition to selling Partnership's corn seed, Hybrids also appears to have sold corn produced by Camerer Farms, non-family growers, and possibly Farmland.

7

On January 1, 1973 Doebler's took a *long leap* forward and announced the formation of a new sales and distribution company – *Doebler's Penna. Hybrids, Inc.* This new unit will take charge of the seed corn after it is produced and bagged by the farms. This includes all aspects of distribution in addition to a greatly expanded research and testing program. The farms will operate as before as T. A. Doebler and Son.

. . . .

We are really enthused about our new organization and its prospects in the years ahead. We hope you will give Doebler's an opportunity to help in the continuing quest for higher yields and better corn.

*Sincerely,*

/s/ T. A. Doebler Jr.

A6209 (emphasis in original). Next to the press release was a picture of a seed bag saying "*Doebler's* HYBRIDS" and "T.A. DOEBLER & SON." Plaintiff Hybrids asserts that upon its formation, Partnership "conveyed its sales and other assets to Hybrids." Appellee Br. at 8. As discussed below, however, there is no writing that expressly assigns the Doebler name to plaintiff.

8

## C.     The Relationship Between the Family Businesses

The relationship between the family businesses is not altogether clear.  Doebler III states that until the time of his father's death in 2002, Doebler II "selected the seed corn grown by all these seed production farms."  Appellants' Br. at 6.  Defendants further claim that even after the formation of Hybrids, Doebler II and Partnership "remained in charge and was the driving force in [Hybrids's] affairs."  Id.  For its part, plaintiff argues that it was Hybrids that set up the dealer network, controlled the use of the mark after 1972, and that it "is and has always been known to the public and the agriculture industry as 'DOEBLER'S.'"  Appellee Br. at 9.[3]  Partnership had no customers and made no retail sales of seed corn after 1972 through 2002, except to Hybrids and Farmland.  In addition, Hybrids did not just sell seed provided by Partnership; it also appears to have sold, under the DOEBLER name, seed produced by Camerer Farms and other non-family providers.

## D.     The Family Business Unravels

Doebler II died in August 2002.  Shortly thereafter, Doebler III approached Jones and offered to buy him out in exchange for his stock and retirement.  For his part, Jones began

---

[3]The parties also dispute how much money was spent by Hybrids on marketing, research, and advertising.  As such factual disputes are not determinative here, we do not focus on them.

secret negotiations with Camerer, who had been fired three years earlier for alleged misconduct. At a meeting of Hybrids' board on October 31, 2002, Camerer – who had been earlier terminated as vice-president – was named president. Doebler III formally resigned from Hybrids on November 15, 2002. On that same day, he filed documents creating LLC. On December 6, 2002, he resigned as a Hybrids director. The assets of Partnership – including its goodwill – were transferred to LLC on April 23, 2003.

### E.   The Seed Business

The plaintiff's trade secret claims regard the names of their "hybrid" strains of corn seed. These seeds are created by mixing the parentage of male and female "inbred" strains. Seed sellers like Hybrids appear to often get their inbred strains and recommendations on hybrid combinations from providers called "foundation companies." Foundation companies indicate what hybrid strains might be worth producing in a particular geographic area. It is not entirely clear, but it appears that plaintiff does not own the genetics of the disputed hybrids and instead licenses them from foundation companies, and that the plaintiff's trade secret claims are instead premised in the names used in connection with those hybrids. Also, at least some of the research done by Hybrids is shared with foundation companies as part of cooperative testing.

It further appears that although multiple seed sellers may offer the same hybrid combinations, that each seller sells its hybrid under a particular product name. For example, Hybrids appears to have sold one strain under the name 667SL; the same

10

hybrid was offered by defendants under the name TA 6890F. This information appears not to be made publicly available to retailers or buyers.

Doebler III, who was once a shareholder, director, and officer of Hybrids, had knowledge of the hybrids marketed by Hybrids and the product names used in connection with each hybrid. He signed a confidentiality agreement with Hybrids. After leaving Hybrids and starting LLC, Doebler III started to offer sales of seed corn directly through LLC. Of the hybrids offered by LLC, 21 were identical in genetic make-up to hybrids offered by Hybrids. LLC's advertising also noted which of its hybrids were identical to hybrids offered by Hybrids.

It should also be noted that a Hybrids employee who left the corporation to join LLC, Robert Laub, brought with him a computer disk with Hybrids' information. Doebler III states that upon learning that the employee had brought the information with him, he had his counsel send the information back to Hybrids.

## F.      District Court Proceedings

On June 27, 2003, Hybrids filed a complaint against Doebler III and LLC in the United States District Court for the Middle District of Pennsylvania. The complaint alleged federal unfair competition and false designation of origin; federal dilution; common law unfair competition; breach of board member agreement; misappropriation of trade secrets;

interference with contract and with prospective economic advantage; breach of fiduciary duty; and vicarious liability.[4]

On September 23, 2003, the District Court entered a preliminary injunction in Hybrids' favor. The Court rejected the contention that customer lists was a trade secret but concluded that the hybrids were trade secrets. It enjoined use of DOEBLER-related marks and use of the hybrids. On September 30, 2003, defendants moved for reconsideration, a motion that the District Court granted in part on October 15, 2003, by allowing defendants to sell the enjoined 21 hybrids, but only as feed corn.[5] On April 19, 2004, the District Court denied a second motion for reconsideration.

On September 8, 2004, the District Court granted motions for summary judgment filed by Hybrids and by third-

---

[4]On December 3, 2003, defendants filed an answer along with affirmative defenses and counterclaims, including trademark claims. On that same date, defendants filed a third-party complaint against Jones and Camerer, alleging multiple counts including trademark claims.

[5]On February 12, 2004, this Court affirmed the preliminary injunction in a non-precedential opinion. See Doebler's Pennsylvania Hybrids, Inc. v. Doebler Seeds, LLC, 88 Fed. Appx. 520 (3d Cir. Feb. 12, 2004). The decision focused on the trade secret issues, concluding that LLC and its employees could not use the plaintiff's trade secrets to compete against Hybrids.

party defendants Camerer and Jones. It granted judgment to Hybrids on all outstanding counts of the complaint.[6] Regarding the trademark claims, the District Court concluded that although there was never any formal agreement transferring the DOEBLER mark, that plaintiff was nevertheless the owner of the mark as a matter of law and that the defendants' use of DOEBLER led to infringement and dilution. The District Court further held that the inbred and hybrid information was a trade secret, and that the family of Doebler businesses were "in practical effect one organization." Regarding interference with contract, the District Court held that defendants had (1) set up their own dealership network using former Hybrids sales managers; and (2) represented that they could sell the same products as Hybrids but under a different name. This was facilitated by trademark and trade secret violations, leading to losses to Hybrids of contracts it had with growers. Regarding the fiduciary duties claim, the District Court pointed to, among other things, the trade secret and trademark violations.

Accordingly, the District Court granted plaintiff a permanent injunction, including enjoining defendants from: using DOEBLER'S or any confusingly similar variant as a mark, trade name, business name, domain name, or symbol of origin; making statements that are likely to mislead the public to believe that defendants' goods or services are associated or

---

[6]The Court also dismissed the remaining counterclaims and third-party claims. As noted in Part II, *infra*, our decision addresses only the permanent injunction and underlying grant of summary judgment in favor of Hybrids.

13

affiliated with plaintiff, or false descriptions, representations, or designations of origin that falsely associate defendants' goods or services with plaintiff; diluting the DOEBLER'S mark; engaging in false description, false representation, false designation of origin, or any other activity constituting unfair competition with plaintiff; offering for sale any of the 21 hybrids sold by plaintiff; disclosing or using the pedigrees of the 21 hybrids sold by plaintiff; or setting forth to any third party any comparison of any hybrid offered for sale by plaintiff with any hybrid sold by defendants.

The Court also noted that counsel had previously stipulated that LLC would cease using the trade name T.A. Doebler Seeds and would instead use T.A. Seeds; the Court indicated that it would find the new trade name acceptable and directed the parties to attempt to propose a new corporate name. The Court also instructed counsel for plaintiff to later notify the Court whether it would pursue a claim for damages, and instructed the clerk to defer entry of final judgment until further order of the court.

## II.

The District Court had subject-matter jurisdiction over the plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over its state-law claims pursuant to 28 U.S.C. § 1367. The appeal is timely.

The labyrinthine posture of this appeal makes it essential to carefully circumscribe the propriety and scope of our review. This case was previously before this Court on appeal from a

14

grant of preliminary injunction, and is before us once again after a grant of summary judgment to plaintiff. We note that the District Court's order is not final for purposes of 28 U.S.C. § 1291 because the District Court did not issue a final judgment pending resolution of damages issues. In Re Good Deal Supermarkets, Inc., 528 F.2d 710, 712 (3d Cir. 1975). We nevertheless have appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which states: "the courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1292(a)(1); see also Cureton v. National Collegiate Athletic Ass'n, 198 F.3d 107, 113 (3d Cir. 1999) (basing appellate jurisdiction over non-final order under § 1292(a)(1) where permanent injunction was based on summary judgment ruling); 15B Charles Alan Wright et al., Federal Practice and Procedure § 3914.28 ("if an injunction is issued on the basis of the summary judgment appeal can be taken under § 1292(a)(1)," but "scope of the appeal, however, is likely to be confined to matters necessary to review the injunction.").[7]

---

[7]In its appellee's brief, plaintiff inexplicably claims "there is no permanent injunction currently in effect." Appellee Br. at 1. This is flatly incorrect. In its order, the District Court granted a permanent injunction to plaintiff, stating that defendants "*are permanently enjoined* . . . ." A2 (emphasis added); see also A71-72 (entry 210 of docket sheet). Indeed, after being prompted by a letter sent by the Court, appellee

15

We review the grant or denial of a permanent injunction for an abuse of discretion. <u>Citizens Financial Group, Inc. v. Citizens Nat'l Bank of Evans City</u>, 383 F.3d 110, 126 (3d Cir. 2004), <u>cert. denied</u>, 125 S. Ct. 1975 (2005). "'An abuse of discretion exists where the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" <u>Id.</u> (quoting <u>A.C.L.U. of N.J. v. Black Horse Pike Reg'l Bd. of Educ.</u>, 84 F.3d 1471, 1476 (3d Cir. 1996)) (additional internal quotes omitted). Here, of course, the permanent injunction is premised entirely on the District Court's grant of summary judgment to plaintiff. Accordingly, to resolve the propriety of the permanent injunction, we must determine whether the District Court erred in granting summary judgment.

"'[S]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law.'" <u>Kornegay v. Cottingham</u>, 120 F.3d 392, 395 (3d Cir. 1997) (quoting <u>Spain v. Gallegos</u>, 26 F.3d 439, 446 (3d Cir. 1994)). "We have held repeatedly that the party moving for

---

backed away from its jurisdictional challenge, conceding that "it does appear that the trial court intended to have a permanent injunction effective upon the issuance of its Order." Plaintiff Letter of June 9, 2005. However, our appellate jurisdiction is not boundless, and we limit our review to the permanent injunction and underlying grant of summary judgment.

16

summary judgment under Fed.R.Civ.P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). "When determining whether there is a triable dispute of material fact, the court draws all inferences in favor of the non-moving party." Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991).

The District Court's earlier grant of a preliminary injunction, and this Court's affirmance thereto, is irrelevant to our review of the grant of summary judgment. In the posture before us – a trademark case in which summary judgment proceedings follow a grant of a preliminary injunction in the plaintiff's favor – the distinction between the standards for summary judgment and preliminary injunction become critical. "Failure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception." Country Floors, 930 F.2d at 1062-63. "[I]nferences concerning credibility that were previously made in ruling on [a] motion for a preliminary injunction cannot determine [a] Rule 56(c) motion and should not be used to support propositions that underpin the decision to grant the motion for summary judgment." Id. at 1062. This is because, *inter alia*, "[c]redibility determinations that underlie findings of fact are appropriate to a bench verdict." Id. But "[t]hey are inappropriate to the legal conclusions necessary to a ruling on summary judgment." Id. A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial. Id. Thus, the sole question before this Court is

17

whether plaintiff met its burden of demonstrating that it was entitled to judgment as a matter of law. As discussed below, we conclude that it did not.[8]

---

[8]We must also note that we are troubled by plaintiff's failure to provide proper citations to the appendix. Rather than providing citations to places in the 8000+ page appendix where original documents and deposition testimony may be found, plaintiff cites almost exclusively to the "Concise Statement of Undisputed Facts" it submitted to the District Court in support of its motion for summary judgment. This submission is not evidence, and unsurprisingly, defendants disputed the accuracy of much of this document before the District Court. As noted by the Second Circuit, a "district court may not rely solely on the statement of undisputed facts . . . ." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). This admonition applies with equal force to this Court on appeal. Cf. Holland v. New Jersey Dept. of Corrections, 246 F.3d 267, 285 (3d Cir. 2001) (court should not "be required to scour the District Court's records and transcripts, without specific guidance, in order to construct specific findings of fact that support the District Court's Order"). As noted by the Seventh Circuit, "'Judges are not like pigs, hunting for truffles buried in' the record." Albrechtsen v. Board of Regents of University of Wisconsin System, 309 F.3d 433, 436 (7th Cir. 2002) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). Here, the plaintiff's near-complete reliance on its "Concise Statement of Undisputed Facts" does not fulfill the mandate in Federal Rule of Appellate Procedure 28(e) for citations to the appendix, particularly considering that it is the

18

## III.

This case demonstrates what may happen when trademark ownership is not explicitly spelled out between a group of related and apparently closely-held companies that use the same name in concert. When things go well, everyone happily uses the name together, but when things go sour, a dispute may arise over a critical business asset: the name. Indeed, the scenario at hand – a family surname used by family companies with a high degree of overlapping ownership and management – is ripe with potential for this very kind of dispute.[9]

Much of the permanent injunction is premised on the District Court's conclusion that defendants – as a matter of law – engaged in federal unfair competition and false designation of

---

movant who carries the burden of showing a lack of disputed material facts. See Aman, 85 F.3d at 1080 (party moving for summary judgment bears burden of demonstrating absence of genuine issues of material fact). To be clear, however, our reversal is based solely on our examination of the issues and the record in the case and is not premised on a potential Rule 28 violation.

[9]Cf. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1297 (9th Cir. 1992) (brother of Ernest and Julio Gallo permitted in marketing cheese to "continue to explain to customers his participation in his business, but not as a trademark or trade name that causes confusion").

origin in violation of 15 U.S.C. § 1125(a), federal dilution in violation of 15 U.S.C. § 1125(c), and common law unfair competition. The threshold premise underlying this outcome is the District Court's conclusion that plaintiff owns the name and mark DOEBLER. Plaintiff provides several arguments as to why it now owns exclusive rights to the name, mark, and formative DOEBLER. First, it argues that the mark was assigned to it by Partnership upon the formation of Hybrids in 1972. Second, plaintiff argues that defendants have abandoned any ownership of DOEBLER and that plaintiff's post-abandonment use vested it with full ownership. Finally, plaintiff suggests that its use of the mark after 1972 effected a transfer. All three of these arguments raise numerous and disputed questions of material fact, making summary judgment inappropriate.[10]

## A.    Assignment

Plaintiff first asserts that Partnership assigned the DOEBLER name to Hybrids in 1972. In response, the District Court succinctly noted, "no formal agreement transferring the DOEBLER'S mark from [Partnership] to [Hybrids] ever

---

[10]Plaintiff also suggests in passing that defendants may have lost their trademark rights through acquiescence or waiver. However, it provides neither argument nor legal support as to how this may have occurred. Such passing and conclusory statements do not preserve an issue for appeal. Lunderstadt v. Colafella, 885 F.2d 66, 78 (3d Cir. 1989); see also Fed. R. App. Proc. 28(a)(9), (b).

existed." We agree and we further conclude that to the extent plaintiff argues it was assigned the mark, this issue raises numerous questions of fact and credibility that preclude summary judgment.

As support for plaintiff's assertion that Partnership conveyed all assets to Hybrids, plaintiff cites to the second meeting minutes dating back to the time of Hybrids' formation over 30 years ago. See A6206-08.[11] These minutes note, among other things, that the operation and maintenance of trucks and cars was to be done by Hybrids, but make no mention of the DOEBLER name or mark, nor do they refer to any transfer of the underlying goodwill. Accordingly, plaintiff does not point to conclusive evidence of an express written assignment.[12]

---

[11]In fact, plaintiff does not even cite to this page range, instead variously citing its "Concise Statement of Undisputed Facts," A447, and to an inapposite page range of A1372 to 1374 of the appendix. This appears to be an error, and we understand plaintiff to instead refer to the second meeting minutes starting at A6206.

[12]During the preliminary injunction proceedings, defendants stated Doebler III and "TADS" (apparently LLC) were the "junior user" of DOEBLER, see Supp. App. at 34. Plaintiff argues in passing that the statement is a concession in support of its position that Partnership never acquired rights in the DOEBLER name prior to the incorporation of Hybrids in 1972. For their part, defendants vigorously argue that Partnership had prior rights to DOEBLER and that those rights

21

Plaintiff also cites to deposition testimony by Camerer stating that the mark was assigned to Hybrids. Even if a writing is lacking, an assignment may be proven in other ways. "If there is no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:4 (4th ed. 2005). However, courts must be cautious in scenarios that do not involve clear written documents of assignment. "Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentive to identify expressly the ownership of the marks they employ." TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 884 (7th Cir. 1997).

The plaintiff's reliance on the possibly self-serving testimony of one of its principals regarding events occurring more than 30 years ago creates important questions for a fact-finder regarding Camerer's credibility, and is simply insufficient to prove a trademark assignment as a matter of law. Moreover, there is documentary evidence that might be found to contradict Camerer: the 1973 advertisement issued upon Hybrids' formation could be read to reflect an intention that the DOEBLER name was to remain in the possession of Partnership. It states "Doebler's took a *long leap* forward and announced the formation of a new sales and distribution

now belong to LLC. Such factual disputes preclude summary judgment.

22

company," and that "We hope you will give **Doebler's** an opportunity to help in the continuing quest for higher yields and better corn." A6209 (first emphasis in original, second bold added). The "Doebler's" being referred to the press release appears to be Partnership, not Hybrids. Accordingly, we cannot conclude as a matter of law that the DOEBLER name and mark was transferred to Hybrids, whether in writing or orally.

## B. Abandonment

Plaintiff next argues that even if Partnership's rights were never assigned to it, those rights were abandoned as a matter of law. Accordingly, suggests plaintiff, its subsequent use of DOEBLER gave it full ownership of the name without any need for assignment. Plaintiff's argument is premised on the assumption that Partnership ceased all direct use of the mark after 1972 and that this cessation constitutes an abandonment. Plaintiff's position ignores the fact that the use of DOEBLER never ceased after Hybrids' incorporation in 1972 and more than likely increased. Plaintiff apparently means to suggest that all use after 1972 was made by Hybrids rather than Partnership, and assuming that to be so, that Partnership abandoned its rights.

We cannot agree that Partnership abandoned its rights to DOEBLER as a matter of law. The Lanham Act states in relevant part that a "mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. A party arguing for abandonment has a high burden of proof: in United

23

States Jaycees v. Philadelphia Jaycees, we held that "abandonment, being in the nature of a forfeiture, must be strictly proved." 639 F.2d 134, 139 (3d Cir. 1981).

Even assuming that only Hybrids used the DOEBLER name after 1972, that would not constitute an abandonment of Partnership's rights as a matter of law. The simple fact is that the use of DOEBLER never ceased. Defendants appear to concede that use of the name was made by Hybrids, but argue that such uses were made with the permission of Partnership. Use of a trademark need not always be made directly by the trademark owner and is often made "with the permission" of the owner via a licensing agreement. Indeed, sometimes the *only* use of a mark is through a licensee. See 2 McCarthy on Trademarks § 18:46 ("Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee."). Such licensing arrangements are permissible so long as the license agreement provides for adequate control by the licensor of the nature and quality of the goods or services.[13] See id.

_____

[13]As noted in the Lanham Act in relation to registered marks, legitimate trademark use by a "related company" shall inure to the benefit of the mark's owner:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the

24

§ 18:42 ("Today, trademark licensing is permitted so long as the licensor maintains adequate control over the nature and quality of goods and services sold under the mark by the licensee."). Moreover, as we have noted:

> the proponent of a claim of insufficient control must meet a high burden of proof. The purpose of the control requirement is the protection of the public. If a licensor does not maintain control of his licensees in their use of the license, the public may be damaged by products that, despite their trademark, do not have the normal quality of such goods.

United States Jaycees, 639 F.2d at 140 (citing Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir. 1976)).

A trademark license is typically written and contains express terms giving the licensor power to engage in quality

---

validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055.

control to ensure that the licensee does not engage in mere "naked" use of the mark. Naked licensing is an "[u]ncontrolled licensing of a mark whereby the licensee can place the mark on any quality or type of goods or services," raising "a grave danger that the public will be deceived by such a usage." 2 McCarthy on Trademarks § 18:48. "[T]he only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees." Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959); see also Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977) ("Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products.").

Failure to provide quality control may constitute naked licensing, leading to abandonment of the mark. Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 873 (3d Cir. 1992). "When the trademark owner fails to exercise reasonable control over the use of the mark by a licensee, the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods and services that are under the control of the owner of the mark." 2 McCarthy on Trademarks § 18:48 (quoting Restatement (Third) of Unfair Competition § 33, cmt. b (1995)). This may result in the trademark ceasing to function as a symbol of quality and controlled source, leading to an involuntary loss of trademark rights. Id.

26

To the extent that plaintiff may rely on a naked licensing theory, its burden is high. "Because naked licensing if established is treated as an abandonment of the trademark, which triggers the loss of trademark rights against the world, anyone attempting to show such abandonment via naked licensing faces a stringent burden of proof." Creative Gifts, Inc. v. UFO, 235 F.3d 540, 548 (10th Cir. 2000); see also United States Jaycees, 639 F.2d at 139 ("abandonment, being in the nature of a forfeiture, must be strictly proved"); Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir. 1976) ("Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof.").

We cannot conclude that the facts establish naked licensing as a matter of law. Although it appears that there is no express written license agreement between the parties, a trademark license can also be implied. See Villanova University v. Villanova Alumni Educational Foundation, Inc., 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.") (citing, *inter alia*, United States Jaycees, 639 F.2d at 140 n.7).

Moreover, the nature of the parties' relationship and conduct may evidence sufficient quality control. The Tenth Circuit has noted that a licensor may justifiably rely on its licensee for quality control where there is a "special relationship" between the parties. Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 872 (10th Cir. 1995) ("In cases in which

27

courts have found that a licensor justifiably relied on a licensee for quality control, some special relationship existed between the parties."); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985) (in light of the fact that licensor supplied at least 90% of the components sold by the licensee and there had been years without complaint, and "[d]ue to [licensor's] association with [licensee] for over ten years and his respect for his ability and expertise, [licensor] felt he could rely on [licensee] to maintain high standards by performing his own quality control").

Such a "special relationship" may exist here, considering that the litigants were closely-held business entities owned and managed by family members and which included a high degree of interlocking ownership and control. Doebler II was a partner in Partnership, and a shareholder, officer, and director of Hybrids. So was defendant Doebler III. In 1972, Doebler II participated in the founding of Hybrids, which was established at least in part to handle marketing and sales. In 1986, Doebler II also founded Farmland, to own and lease the farm for Partnership seed corn production.

It is true that the corn seed sold by Hybrids was not solely from Partnership. In addition to selling Partnership's corn seed, Hybrids also sold corn produced by Camerer Farms and non-family growers. However, evidence exists that Doebler II was involved in selecting corn grown by these farms up until 2002, the year he died. As plaintiff itself notes, "the Doebler family companies were always intended to work together." Appellee Br. at 32 n.7. A reasonable fact-finder could conclude that these companies worked together, and that Doebler II, in his dual

28

roles in Partnership and Hybrids, ensured that Hybrids' use of the mark was conducted with appropriate quality controls. Such a fact may be highly pertinent in persuading a fact-finder that Partnership, via an implied license agreement, consented to Hybrids' use of the mark and exercised adequate quality control. We therefore cannot conclude as a matter of law that the DOEBLER name and mark was abandoned.[14]

## C. Divestment of Ownership Via Hybrids' Use

Hybrids' final argument is that it somehow came to own the mark through its use starting in 1972. The District Court held that it did:

> A review of the evidence reveals that upon the formation of [Hybrids] in 1972, it took over from [Partnership] all of the research, marketing, sales, and distribution activities previously performed by [Partnership]. Therefore, since 1972, [Partnership] has functioned solely as a production company. Despite the fact that no formal agreement transferring the DOEBLER'S mark from [Partnership] to [Hybrids] ever existed, it is clear that the mark belongs to [Hybrids].

---

[14]We do not at this time address the propriety or applicability of "licensee estoppel," which has been held by some courts to estop a trademark licensee from challenging the validity of marks it has licensed. See generally 2 McCarthy on Trademarks § 18:63.

[Hybrids] has spent more than 30 years setting up a dealer distribution network and using and promoting the DOEBLER'S mark on and in connection with the agricultural seed products it sold. As noted by plaintiff, [Partnership] was not the sole producer of DOEBLER'S products – Camerer Farms, Inc., [Farmland], and several outside growers also produced DOEBLER'S products. It was [Hybrids], however, that continuously, extensively, and exclusively used the DOEBLER'S mark in connection with its business. Moreover, [Hybrids] has spent more than $800,000 in advertising in the last five years, and has come to be known as "Doebler's" among its customers and dealers. Thus, no reasonable juror could find that the DOEBLER'S mark does not belong to plaintiff.

A25-26.

We disagree with the District Court's reasoning. Assuming that Partnership did not enter into a formal assignment as a matter of law, nor that it abandoned the mark as a matter of law, the District Court appears to nevertheless conclude – as a matter of law – that Hybrids now owns the mark through its assumption of research, marketing, sales, and distribution activities. Paring this analysis to its core, it appears that the District Court would hold that a distributor that takes on too much of the trademark owner's former activities can take over the mark as well.

30

It is true that in a manufacturer-distributor relationship, sometimes the distributor will own a mark rather than the manufacturer. Professor McCarthy notes two scenarios where ownership might be disputed between manufacturer and distributor:

(1) When the manufacturer is the user and owner of a mark and then enters into a distribution relationship with a dealer, the dealer does not acquire trademark rights in the goods it distributes. Such a relationship is simply either one of a non-trademark-licensed buyer who resells branded merchandise or of a dealer licensed under the trademark to hold himself out as an authorized dealer. In either case, the dealer does not own the trademark.

(2) When a dealer buys goods from a manufacturer and applies or has someone else apply the dealer's own "merchant's mark" to the goods, the dealer, not the manufacturer, is the owner of such a trademark. If the dealer orders the manufacturer to place the mark on the product prior to delivery, then the manufacturer is acting as a " licensee" of the dealer.

2 McCarthy on Trademarks § 16:48 (footnotes omitted). The first scenario arises when a manufacturer who already owns a mark enters into an agreement with a distributor to sell the manufacturer's branded goods. As McCarthy notes, such a relationship may operate under a trademark license or it may

31

not. But such conduct does not, by itself, vest ownership of the mark in the distributor. The second scenario arises when the distributor (or dealer) takes goods from the manufacturer and the dealer puts its own mark on the goods. In that case, the dealer is the owner of the mark, even if the manufacturer affixes the mark to the goods on behalf of the dealer.

It is clear that the DOEBLER mark existed long before Hybrids came into existence, so it can hardly be said that Hybrids affixed its "merchant's mark" to the goods. Unless ownership to the name vested in Hybrids via assignment or abandonment – issues that raise numerous disputed questions of material fact – the mere fact that the parties may have had a manufacturer-distributor relationship does not by itself vest ownership of the mark in Hybrids.[15]

In disputes between a manufacturer and distributor over ownership of a mark, Professor McCarthy suggests that a court first look to contractual expectations. 2 McCarthy on Trademarks § 16:48. He further suggests that if there is no contractual provision regarding ownership, courts should look at consumer expectations, weighing factors such as the following:

> 1. Which party invented or created the mark.

---

[15]Hybrids argues that it was no mere distributor, but it is clear that the nature of the parties' relationship is yet another disputed question of material fact that precludes summary judgment.

2. Which party first affixed the mark to goods sold.

3. Which party's name appeared on packaging and promotional materials in conjunction with the mark.

4. Which party exercised control over the nature and quality of goods on which the mark appeared.

5. To which party did customers look as standing behind the goods, e.g., which party received complaints for defects and made appropriate replacement or refund.

6. Which party paid for advertising and promotion of the trademarked product.

Id. (footnotes omitted).

We conclude that this approach is inapplicable in cases where initial ownership has already been established and an express assignment is lacking. In TMT North America, Inc. v. Magic Touch GmbH, the Seventh Circuit held that although such factors may be appropriate where initial ownership of a mark is in dispute, once initial ownership is established, a multi-factor test would be inappropriate to divest that ownership – a trademark owner may "lose its rights by assignment or by abandonment, but not by some nebulous balancing test." 124 F.3d 876, 884 n.4 (7th Cir. 1997). We agree. The Lanham Act expressly provides how ownership may be divested through

33

abandonment, see 15 U.S.C. § 1127, and how ownership of registered marks may be divested through assignment, see id. § 1060. To follow a divestive balancing test where initial ownership is already established, and where assignment or abandonment cannot be shown, would flout the Lanham Act by permitting a finding of abandonment under another name, even when abandonment cannot be established under the statute. Considering that abandonment must be "strictly proved," United States Jaycees, 639 F.2d at 139, we will not permit it to be found under a different name through a balancing test.

Moreover, even if we were to apply the contractual/consumer expectations approach, we could not conclude that ownership was divested as a matter of law. Regarding the parties' contractual expectations, there was no express assignment.[16] Even if we turned to consumer

_____

[16]The present dispute is thus different from Premier Dental Products Co. v. Darby Dental Supply Co., Inc., 794 F.2d 850 (3d Cir. 1986), where a domestic distributor was expressly assigned a mark by a foreign manufacturer; the distributor (the assignee) then sued a grey marketer. At issue was whether the express assignment from the foreign manufacturer to the domestic distributor was effective. We stated that although ownership "is largely determined by the parties' agreement," id. at 854, that under the circumstances of that case, a written agreement was not completely determinative, requiring us to further inquire as to who owned the goodwill, looking to: (1) who engages in control over the quality of goods; or (2) who is perceived by the public as to who stands behind the mark. Id.

34

expectations, those factors would not point towards Hybrids as a matter of law because: (1) Partnership created the mark; (2) Partnership first affixed the mark to goods; (3) Partnership's name initially appeared on packaging and promotional materials, and later on, Hybrids' name (and perhaps Partnership on occasion as well); (4) Partnership's quality control is a disputed issue of material fact; (5) Hybrids may have become the party to whom consumers eventually looked as standing behind the goods but that again appears to be a question of fact; and (6) the parties dispute the nature and significance of any reimbursement by Partnership to Hybrids for marketing expenses. Thus, even if we applied a balancing test, numerous disputes of material fact would prevent it from supporting the grant of summary judgment.[17]

at 854-55. To the extent that we followed a balancing approach in Premier Dental, that case – which involved an express trademark assignment – is not controlling here, particularly considering that the question of assignment is heavily disputed.

[17]It may be that the family name "Doebler" is "primarily merely a surname," and that the DOEBLER mark and marks incorporating DOEBLER as a formative are descriptive rather than inherently distinctive. Cf. 15 U.S.C. § 1052(e)(4) (such marks not registrable). The parties recognize, however, that even descriptive marks can attain "secondary meaning" and thus attain trademark protection. See Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 282-83 (3d Cir. 2001) ("descriptive marks with a demonstrated secondary meaning are entitled to trademark protection")

35

## IV.

We turn next to the other major premise underlying the District Court's grant of a permanent injunction: the conclusion that defendants engaged in trade secret misappropriation as a matter of law. Plaintiff asserts that its trade secrets consist "of the brand names attached to the various hybrids researched, developed and marketed" by Hybrids. Appellee Br. at 56. It is undisputed that defendant Doebler III signed a confidentiality agreement with plaintiff, was a fiduciary to that corporation, had access to the information, and used the information.[18] Nevertheless, we conclude that plaintiff has not met its burden of showing an absence of any genuine issues of material fact

_____

(footnotes omitted). Unsurprisingly, as both parties vie for ownership of DOEBLER, each takes the position that the various DOEBLER marks have attained secondary meaning. That may be correct but we need not address that matter because we resolve the trademark issues before us on the basis of ownership. Along similar lines, we do not address whether the use of DOEBLER by defendants would cause trademark infringement, trademark dilution, or unfair competition.

[18]A former employee of plaintiff, Robert Laub, took a disc containing allegedly proprietary information with him when he joined LLC as an employee. The disc was later returned to plaintiff by defendants' counsel. Because we conclude that plaintiff cannot establish that its brand names are trade secrets as a matter of law, the contents of the disc are not determinative at this juncture.

regarding the threshold question of whether the plaintiff's brand names are legally protected as trade secrets.

Plaintiff sells "hybrid" strains of corn seed, which are created by mixing the parentage of male and female "inbred" strains. Seed sellers like Hybrids (and for that matter, defendants) appear to get their inbred strains and recommendations on hybrid combinations from providers called "originator" or "foundation companies" that patent seed genetics and license seed companies to plant, grow, and sell hybrids they recommend. The foundation companies sell to the grower the inbred strains, and the growers combine them to make the recommended hybrids. The growers then sell the hybrid corn seeds.[19]

---

[19]

"Hybrid" corn seed is produced by planting two inbred parents together and allowing pollen from one inbred (used as the male parent) to fertilize silks on the other inbred (used as the female parent). In corn, inbred lines are lines developed by self-pollination and selection until the line is relatively homozygous. Inbred lines may be "public" if developed and released by a public university, or "private" if developed by a private entity.

Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc., 35 F.3d 1226, 1228 n.2 (8th Cir. 1994).

Defendants assert that neither plaintiff nor defendants developed or own any of the hybrids which were enjoined, but rather, that they are recommended by foundation companies. The hybrid pedigrees that are well adapted to growing conditions in a geographic area are known by the foundation companies, which make recommendations to their licensees as to which hybrids they might grow. Barry Johnson of MBS Genetics (a foundation company) testified that he would have no hesitation to recommend the same hybrids to Doebler III or anyone else with a license. Matthew Nice of Thurston Genetics (also a foundation company) testified that "in reality most companies are selling the same pedigrees under their own brand names to customers."

At least some of plaintiff's research regarding the hybrids is passed on to foundation companies such as Monsanto (and apparently to other respective foundation companies), which in turn shares some of those findings with other licensees who report their findings. Defendant LLC has a similar license with Monsanto.

The nature of the trade secret here, as stated by plaintiff, is the name used by Hybrids in selling a particular hybrid. For example, Hybrids appears to have sold one strain under the name 667SL; the same hybrid was offered by defendants under the name TA 6890F. This information appears not to be made publicly available to retailers or buyers. The trade secret misappropriation alleged arises from the fact that defendants used their knowledge of the pedigree corresponding to Hybrids' 667SL to market the same hybrid pedigree as LLC's TA 6890F.

38

Defendants further used a comparison sheet to indicate which of its hybrids corresponded to the same hybrids sold by plaintiff.

Under the circumstances of this case, we cannot agree that the brand names attached to the plaintiff's hybrids – 21 of which defendants were enjoined from selling – are trade secrets as a matter of law. Under Pennsylvania law, a plaintiff must show:

> (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1255 (3d Cir. 1985).[20]

_____

[20]Since the complaint was filed, Pennsylvania enacted the Uniform Trade Secrets Act, 12 Pa.C.S.A. § 5301 et seq. However, the Act "shall not apply to misappropriation occurring prior to the effective date of this act [April 19, 2004], including a continuing misappropriation that began prior to the effective date of this act and which continues to occur after the effective

39

Here, the threshold question is whether the brand names attached to the hybrids are trade secrets. A trade secret is defined as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Id. (quoting Restatement of Torts § 757 cmt. b). Factors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Id. at 1256 (quoting Restatement of Torts § 757 cmt. b).

Assuming that the names of the plaintiff's hybrids might constitute a trade secret, disputed questions of material fact remain. Hybrids did not get Doebler III to sign a confidentiality agreement until 2001. Although this fact does not mean that Doebler III – a fiduciary to plaintiff – lacked duties of confidentiality towards Hybrids, it may suggest that Hybrids did not consider the names of its hybrids to be a trade secret. Doebler III also asserts that the relationship between hybrid varieties and Hybrids' brand names was not discussed in board

date of this act." Id. § 5301 hist. & stat. note. We therefore rely on the approach taken prior to the Act's enactment.

meetings. Also, Camerer testified that he may have disclosed "characteristics" of some of Hybrids' enjoined pedigrees to Matthew Nice, a representative of a foundation company. It is unclear, but we infer, that these characteristics may include the brand names of some of the enjoined hybrids.[21]

Although foundation companies do not tell their customers which seeds other growers use, such information appears to be indirectly discernable to competitors. A seed grower need only contact a foundation company, which will provide the grower with information on which hybrids are best adapted to particular growing areas. It is possibly significant

---

[21]In addition, defendants assert that Camerer himself sold corn produced by his own company, Camerer Farms, with the same pedigree combinations sold by Hybrids. Because the asserted trade secret was the brand name of the relevant hybrids, perhaps Hybrids did not object because Camerer Farms did not reveal Hybrids' corresponding brand names. If true, this would underscore that the real dispute is not over the sale of genetically identical hybrids, but rather the defendants' actions in identifying which Hybrids products correspond to LLC products. This would appear to implicate the Federal Seed Act, discussed *infra*. Indeed, if the sum of the asserted trade secret is simply the brand name of a particular hybrid, and if the foundation companies recommend the same hybrids to all growers in the same geographical area, it is hard to fathom how an injunction could properly bar defendants from selling any of the enjoined hybrids. This leaves simply the question of whether the brand names are trade secrets.

that Hybrids was required to share some research with other licensees through the foundation companies' cooperative research programs. The nature of the research being shared may include what hybrids are generally grown in particular areas; such information would appear to be available to others, including LLC. Significantly, Daniel Anderson, a Monsanto representative testified that although he would not tell LLC what hybrids he would recommend to Hybrids, or vice-versa, he admitted that in all likelihood, he would recommend the very same lines to both. It would appear as a practical matter that all growers in a particular area would grow many of the same hybrids.

In addition, and depending on how the facts are developed on remand, we are troubled by the prospect that the assertion of trade secret protection may violate the Federal Seed Act, 7 U.S.C. §§ 1551 et seq. "The Federal Seed Act makes it unlawful for any person to transport or to deliver for transportation in interstate commerce agricultural seeds with untruthful labels." E.K. Hardison Seed Co. v. Jones, 149 F.2d 252, 256 (6th Cir. 1945). Part of the labeling requirement is that when variety names are used, all sellers use the same variety name. Thus, to the extent that the plaintiff's "brand names" might turn out to be "variety" names, the Federal Seed Act would appear to require all others – including defendants – to

42

use the same variety name.  Regarding agricultural seeds,[22] the Federal Seed Act provides:

> It shall be unlawful for any person to transport or deliver for transportation in interstate commerce–
>
> (a) Any agricultural seeds or any mixture of agricultural seeds for seeding purposes, unless each container bears a label giving the following information, in accordance with rules and regulations prescribed under section 1592 of this title.

---

[22]"Agricultural seeds" are defined as "grass, forage, and field crop seeds which the Secretary of Agriculture finds are used for seeding purposes in the United States and which he lists in the rules and regulations prescribed under section 1592 of this title."  7 U.S.C. § 1561(a)(7)(A).  "Vegetable seeds" "shall include the seeds of those crops that are or may be grown in gardens or on truck farms and are or may be generally known and sold under the name of vegetable seeds."  Id. § 1561(a)(7)(B).  The Federal Seed Act imposes somewhat similar requirements for vegetable seeds, requiring a label with the "name of each kind and variety of seed."  Id. § 1571(b)(1)(A) (certain containers under one lb.), 1571(b)(2)(A) (certain containers under one lb.), 1571(b)(3)(A) (containers over one lb.).  It would appear that the plaintiff's seeds are agricultural seeds, but this matter should be resolved on remand.

(1) The name of the kind or kind and variety for each agricultural seed component present in excess of 5 per centum of the whole and the percentage by weight of each: *Provided*, That (A), except with respect to seed mixtures intended for lawn and turf purposes, if any such component is one which the Secretary of Agriculture has determined, in rules and regulations prescribed under section 1592 of this title, is generally labeled as to variety, the label shall bear, in addition to the name of the kind, either the name of such variety or the statement "Variety Not Stated" . . . .

7 U.S.C. § 1571(a)(1).

The Federal Seed Act and regulations require labels for agricultural corn seed include either the kind and variety,[23] or the kind and the statement "Variety Not Stated."[24] The

---

[23]"Kind" "means one or more related species or subspecies which singly or collectively is known by one common name," such as soybeans. 7 U.S.C. § 1561(a)(11). "Variety" "means a subdivision of a kind which is characterized by growth, plant, fruit, seed, or other characters by which it can be differentiated from other sorts of the same kind," such as "'Manchu' soybeans." Id. § 1561(a)(12).

[24]7 U.S.C. § 1571(a)(1). For agricultural corn seeds, labeling by type alone is impermissible because of implementing

44

regulations require that brand names be used separately and distinctly from the variety name, and not <u>as</u> the variety name:

> Brand names and terms taken from trademarks may be associated with the name of the kind or variety of seed as an indication of source: *Provided*, That the terms are clearly identified as being other than a part of the name of the kind or variety; for example, Ox Brand Golden Cross sweet corn. Seed shall not be advertised under a trademark or brand name in any manner that may create the impression that the trademark or brand name is a variety name. If seed advertised under a trademark or brand name is a mixture of varieties and if the variety names are not stated in the advertising, a description similar to a varietal description or a comparison with a named variety shall not be used if it creates the impression that the seed is of a single variety.

---

regulations. Although section 1571(a)(1) indicates that labels normally may include type alone, that section further indicates that the Secretary of Agriculture may additionally require that variety be disclosed unless the "Variety Not Stated" disclaimer is used. The relevant regulations expressly state that field corn be "generally labeled as to variety and shall be labeled to show the variety name or the words 'Variety Not Stated.'" 7 C.F.R. § 201.10(a).

7 C.F.R. § 201.36b(e). This regulation indicates that one cannot use a brand name <u>as</u> the variety name, or vice-versa.[25] The regulations further indicate that "[h]ybrid designations shall be treated as variety names." 7 C.F.R. § 201.2(y). Here, although the briefs are less than clear on this point, it would appear that the plaintiff's hybrid seeds might be marketed in a manner like "Doebler's Hybrids 667SL," making "Doebler's Hybrids" a

---

[25]The Patent and Trademark Office ("PTO") takes a similar approach to variety names in trademark applications, instructing trademark examiners that "[v]arietal or cultivar names" are names that might "consist of a numeric or alphanumeric code or can be a 'fancy' (arbitrary) name," and which "amount to the generic name of the plant or seed by which such variety is known to the public." United States Patent and Trademark Office, <u>Trademark Manual of Examination Procedures</u> § 1202.12 (4th ed. April 2005). The manual further indicates that if wording sought to be registered as a mark for agricultural seeds comprises a varietal or cultivar name, then trademark registration must be refused or accompanied by a disclaimer, "on the ground that the matter is the varietal name of the goods and does not function as a trademark." <u>Id.</u>; <u>see also</u> <u>In re KRB Seed Co.</u>, 76 U.S.P.Q.2d 1156 (T.T.A.B. 2005) (refusing registration to REBEL because it is a varietal name for a type of grass seed). The plaintiff's brand names, which appear to include terms such as 667SL, seem to fall within the PTO's description of marks that consist of a numeric or alphanumeric code, and thus varietal names.

trademark and "667SL" the variety name.[26] The regulations indicate, however, that "[t]he same variety name shall not be assigned to more than one variety of the same kind of seed." 7 C.F.R. § 201.34(d)(3). Assuming that plaintiff was the first to name this particular hybrid, the Federal Seed Act would appear to require defendants to use the same designation – 667SL – when selling the same hybrid.

Support for this conclusion may be found with the Agricultural Marketing Service of the U.S. Department of Agriculture ("AMS"), which states that once any seller has named a hybrid, all sellers must use the same hybrid name so that buyers know what they are getting. AMS, <u>Facts About: Naming and Labeling Varieties of Seed</u> <www.ams.usda.gov/lsg/seed/factsabt.pdf> ("AMS, <u>Facts About Seeds</u>"). The publication states: "The originator or discoverer of a new variety may give that variety a name." <u>Id.</u> In addition, "the name first used when the seed is introduced into commerce will be the name of the variety." <u>Id.</u> "It is illegal to change a variety name once the name has been legally assigned. In other words, a buyer may not purchase seed labeled as variety 'X' and resell it as variety 'Y.'" <u>Id.</u> "Marketing seed under the wrong name is misrepresentation." <u>Id.</u>

The flyer goes on to note a scenario that could be pulled directly from the facts of this case:

---

[26]Of significance is the fact that the defendants' comparison sheet listed its own codes under a column entitled "variety."

47

In the case of hybrids, however, the situation is potentially more complex since more than one seed producer or company might use identical parent lines in producing a hybrid variety. One company could then produce a hybrid that was the same as one already introduced by another firm.

When this happens, both firms must use the same name since they are marketing the same variety.

If the people who developed the parent lines have given the hybrid variety a name, that is the legal name. Otherwise, the proper name would be the one given by the company that first introduced the hybrid seed into commerce.

U.S. Department of Agriculture seed regulatory officials believe the following situation occurs far too often:

"State University" releases hybrid corn parent lines A and B.

John Doe Seed Company obtains seed of lines A and B, crosses the two lines, and is the first company to introduce the resulting hybrid into commerce under a variety name. John Doe Seed Company names this hybrid "JD 5259."

La Marque Seeds, Inc., obtains lines A and B, makes the same cross, and names the resulting hybrid variety "SML 25." There has been no change in the A and B lines that would result in a different variety. La Marque ships the hybrid seed, labeled "SML 25," in interstate commerce, and violates the Federal Seed Act because the seed should have been labeled "JD 5259."

Id.

The scenario described above appears to be squarely on-point with the current case, and if there is an explanation for why it does not apply to this situation, plaintiff has failed to indicate why; indeed, plaintiff does not bother at all to respond to the merits of the defendants' Federal Seed Act argument.[27] If

---

[27]Although defendants discuss the Federal Seed Act in their opening brief, plaintiff does not bother to address the questions on the merits, instead claiming without citation or explanation that the defendant's Federal Seed Act argument was "abandoned." See Appellee Br. at 54-55 n.17. Plaintiff further complains that there is no private right of action under the Seed Act, but the question of whether the Act provides a private right of action (which defendants do not suggest) is irrelevant as to whether the Act requires defendants and plaintiff to use the same variety names. Finally, plaintiff appears to suggest that defendants are equally guilty of wanting to protect the pedigrees underlying their variety names, but two wrongs don't make a right.

defendants are *required* by the Federal Seed Act to use the same variety name as defendants when selling the same hybrid of corn seed, and if the plaintiff's disputed "brand names" are in fact mere variety names,[28] it is difficult to understand how plaintiff may consider the variety name corresponding to a particular pedigree to be a trade secret at all.[29]

Our analysis, however, is hampered by the lack of clarity in the briefs and record as to how variety names are chosen by the parties and within the industry. We do not understand, for example, how it is possible for a pedigree to be secret if the Federal Seed Act requires all persons selling a particular hybrid variety to use the same variety name. Yet if all seed sellers keep their pedigrees secret (either because they do not disclose the pedigrees or because sellers and foundation companies work together to maintain such secrets), then how would seed sellers ever be able to comply with the Federal Seed Act? Regardless, under the unique facts of this case – where the defendants'

---

[28]"The status under the Federal Seed Act of a variety name is not modified by the registration of such name as a trademark." 7 C.F.R. § 201.34(d)(4).

[29]This case is therefore unlike Pioneer Hi-Bred International v. Holden Foundation Seeds, Inc., 35 F.3d 1226 (8th Cir. 1994), where the Court affirmed a finding of trade secret misappropriation regarding the genetic make-up of certain seed corn. The Federal Seed Act's labeling requirements were not at issue in that case, and we do not understand plaintiff to assert trade secret rights in the genetic make-up of its seed.

50

relationship to plaintiff gave them specific knowledge of the hybrid pedigrees underlying the plaintiff's brand names – it would appear that the Act would require use of the pre-existing variety names. If the brand names at issue are not variety names, plaintiff does not explain why that would be so.

Accordingly, the grant of summary judgment for trade secret misappropriation will also be reversed.[30] In light of the lack of clarity regarding this matter, we do not at this time hold that the Federal Seed Act prohibits the assertion of trade secret rights. But on remand, the District Court should permit further development of this issue with particular regard to, among other things: the variety names used for the relevant hybrids; who created those hybrids; who named the hybrids; and the practices of the industry.

## V.

The entry of a permanent injunction was premised entirely on the District Court's conclusion that plaintiff was entitled to summary judgment. We conclude that the existence of numerous issues of material fact precludes summary judgment on any of these counts.[31] Accordingly, the order of the

---

[30]Plaintiff does not suggest that its hybrids are being used in violation of Patent Law or the Plant Variety Protection Act.

[31]We note that the District Court also granted summary judgment to plaintiff on its claims for interference with contract, breach of fiduciary duty, and vicarious liability. Plaintiff does

51

District Court will be reversed, and the matter will be remanded for further proceedings.

---

not bother to brief these claims, instead incorporating by reference the analysis of the District Court. Because the fate of those claims is inextricably tied to the outcome of the plaintiff's trademark and trade secret claims, we do not address whether the plaintiff's attempt to incorporate the decision below flouts Federal Rule of Appellate Procedure 28(a)(9) & (b) (requirements for argument section of appellee's brief) or 32(a)(7) (length of briefs). Accordingly, the grant of summary judgment to plaintiff for those counts will be reversed as well.